PARSONS *et al. v.* LYMAN.

The rule that personal property is subject to the law which governs the person of its owner, as to its transmission by bequest or intestacy, though founded on international comity, is equally obligatory upon our courts as a legal rule of purely domestic origin.

A foreign administrator, though having no authority as such to coerce the collection of assets in this State, is equally accountable to the tribunal appointing him where they are voluntarily paid or delivered to him here, as if they were collected within its jurisdiction.

An executor appointed in Connecticut receiving payment, without suit, from debtors of the decedent within this State, may account therefor to the Probate Courts of Connecticut; and the fact that he subsequently takes out letters of administration in this State, does not make him liable to account here for such assets in the course of administration under the orders of the foreign tribunal.

Whether the courts of this State are to decree distribution of the assets collected here under an ancillary administration granted by them, or to remit the disposition thereof to the courts of the testator's domicil, is not a question of jurisdiction but of judicial discretion upon the circumstances of the particular case.

The testator died a resident of Connecticut, as were his executors and legatees. Five-sixths of the estate was before the Probate Court of that State for accounting and distribution, and the executor desired to remit to that jurisdiction the distribution of the remainder which had been collected by virtue of administration granted to him by the Surrogate of

New York. Several of the legatees who, after the testator's death, became residents of this State, insisted that the distribution should be decreed by the Surrogate of New York, to whom the executor had applied for a final settlement of his accounts. It appeared that the Surrogate differed in opinion from the courts of Connecticut in reference to the construction of the will: *Held*, that the Surrogate should have remitted the distribution to the courts of Connecticut.

APPEAL from a judgment of the Supreme Court in the first district, pronounced on a review, by appeal, of a sentence of the Surrogate of the county of New York, upon the accounting of the respondent, Lyman, as executor of Samuel Parsons, deceased.

The testator, at the time of his death, on the 24th day of October, 1848, was a resident of Durham in the State of Connecticut, where he had resided many years. On the 7th day of the same month he duly executed his last will and testament, of which he appointed Lyman, the respondent, who resided and still resides at Middletown in Connecticut, and his wife Elizabeth Parsons, his executor and executrix. He gave to his wife his homestead at Durham with the furniture and the farming utensils, and an annuity of $700 a year during widowhood, to be paid by his executors. He then disposed of the residue of his estate as follows:

"5. All the rest, residue and remainder of the estate, real and personal, of every nature and description that shall belong to me, or to which I shall be in any way or manner entitled at law or in equity at the time of my decease, subject to the foregoing provision for my said wife, I give, devise and bequeath to my executors, hereinafter named, and their heirs, executors, administrators and assigns, *in trust*, two-fifth parts thereof for the sole use and benefit of my son Joseph H. Parsons and his heirs and assigns forever, and the remaining three-fifth parts thereof for the sole use and benefit of my daughters Catherine M. Parsons, Elizabeth A. Parsons and Caroline J. Parsons in equal shares to them respectively and their respective heirs and assigns forever. During the minority of my said children

Parsons *v.* Lyman.

respectively, the said trustees are directed to expend such sums for their support and education respectively as may seem to be expedient, charging the sums expended for each towards his or her share of my said estate.

" The said trustees shall pay to my said son on his attaining to the age of twenty-one years the sum of $5,000, and if they judge best a further sum not exceeding $5,000 more, if they think it will be for his interest; on his attaining to the age of twenty-three years, the said trustees shall pay to him such an amount as they shall deem it most to his interest to receive, not exceeding $10,000; on his attaining the age of twenty-five years the said trustees shall pay to him such sums as in their sound discretion they shall consider it most for his interest to receive, but not exceeding in any one year the sum of $10,000 dollars; and they shall so continue to make such payments from one period of two years to another until the share of my said son shall have been fully paid off and discharged.

" The said trustees shall pay to each of my said daughters on their respectively attaining to the age of twenty-one years the sum of $2,000, and every two years thereafter the sum of $2,000 until the share of each shall have been fully paid off and discharged; but if, after making said first payment to each of my said daughters, my said trustees shall deem it expedient to make the subsequent payments less than $2,000 each, they are authorized in the exercise of a fair and sound discretion to diminish such payments accordingly, provided they use no unnecessary delay in making ultimate payment of the share of each as aforesaid.

" If my said son shall die before receiving payment of his share as aforesaid, leaving no lawful issue, then his said share remaining in the hands of said trustees shall be paid and delivered over in equal shares to my daughters and their heirs and assigns forever; and if any one or more of my said daughters shall die before receiving payment of their respective shares as aforesaid, then, in case such decedent or decedents shall leave no lawful issue, their respective shares aforesaid remaining, in the hands of said trustees, shall be paid and delivered over

in such manner and proportion that my said son shall have two-fifths of each share, and the surviving daughters the residue thereof in equal shares to them respectively and their respective heirs and assigns forever. If any one or more of my said children shall die leaving lawful issue, then such issue shall be entitled in equal portions to the share or shares of the respective parent or parents remaining in the hands of said trustees; but in such case the said trustees are empowered and directed to hold and dispose of such share or shares in such manner that such issue only, and their legal representatives, and no other person or persons, shall have any benefit or advantage thereof."

The will stated that the testator owned two houses in the city of New York, which were described, and which he held under leases for terms of years with clauses of renewal, which houses he directed his executors to sell and to add the proceeds "to the general fund." He directed that his bills and notes should be collected through a bank or banks, and that their proceeds, as well as all other funds which should come to the hands of his executors, should be invested in some safe interest-paying stocks, National or State, and some few banks of undoubted character and credit, until such funds should be wanted to fulfill the provisions of his will. He stated that he had $600 in the stock of a fire insurance company in New York, which he directed should not be sold unless some change should take place in the management of the company. He directed that his executors should not be required to give bonds, and that they should have a fair compensation for their services.

The executors immediately proved the will before the Probate Court of the proper district in Connecticut, and proceeded to the execution of their duties as executors.

The testator's four children named in the will were all minors at his death, and were then members of his family. They continued to reside at Durham for about four years afterwards. At the commencement of the proceedings before the Surrogate

of New York in December, 1856, they had all become of age except the youngest daughter Caroline, who was in her twenty-first year. Elizabeth had married William Stanley; and they all then resided in the city of New York, or in Kings county. The widow and co-executrix continued to reside at Durham. The four children, the husband of Elizabeth, and the widow of the testator are the appellants in the present appeal.

The testator left an estate of about $147,000, which embraced about $84,411.33 in debts owing him by individuals and firms residing in and doing business in the city of New York; it was productive, yielding an income of about $8,000. The debts of the testator amounted to about $2,200.

Prior to the 3d of November, 1849, the executors had collected, by means of voluntary payments to them without suit, all the moneys due the estate from debtors residing in the city of New York; and on that day the respondent, Lyman, on behalf of himself and his co-executor, made and returned to the Court of Probate in Connecticut, an inventory of the whole estate, with detailed accounts of all their receipts and payments; which account, after due notice given to the parties interested, was allowed and placed on file on the 20th day of that month. All the debts against the estate had been paid prior to that time. From thenceforward the executors rendered annual accounts with schedules of the property on hand to the Court of Probate, which were regularly examined, allowed and filed, according to the laws of that State. These accounts included the moneys received in New York as well as elsewhere. They had invested all the moneys of the estate realized by them in State stocks and in the stocks of certain banks, in their names as executors and trustees.

During the minority of the testator's children, the executors defrayed the expenses of their support and education according to the provisions of the will, and they paid the annuity to the widow, and, as the three eldest children respectively came of age, the executors advanced to them the several sums directed by the will to be paid them.

On the 15th of March, 1855, the executors applied for and received letters testamentary from the Surrogate of the county of New York, having before that time, and in November, 1848, proved the will before the said Surrogate. After receiving the letters, they sold the leasehold houses in New York for above $18,000, and received the bonds and mortgages of the purchasers in their own names as executors and trustees. Afterwards, on the 3d of December, 1856, the executors presented a petition to the Surrogate of New York, stating that they were desirous of rendering a final account of their proceedings, and praying for a citation for that purpose, which was accordingly issued and served on the legatees, returnable on the 15th of January, 1857. On that day the executors presented their account, which embraced only the rents of the leasehold houses, the dividends of the insurance stock, and the proceeds of the sale of the houses, with which they charged themselves to the amount, in the aggregate, of $37,367.57; claiming credit for ground rent and taxes, and as to the residue, "for payments to the estate in Connecticut;" thus balancing the account. The legatees, the children of the testator, and Stanley the husband of Elizabeth, put in written objections, in which they claimed that the account was defective in not embracing the other moneys received by the executors from debtors living in New York; and erroneous in attempting to transfer the moneys received in New York to the jurisdiction of the Court of Probate in Connecticut; and insisted that they were bound to account for the whole to the Surrogate. Before any order was made by the Surrogate, the legatees, on the 10th of February, 1857, presented a petition to him, asking for a construction of the will, and claiming that besides the several sums directed to be paid to them every two years, they were respectively entitled to the simple interest on their respective shares of the estate, and praying that it might be decreed to them. Mr. Lyman, the executor, put in answers to the objections of the legatees and to their petition, stating that he was advised that he was bound to account only to the Court of

Probate in Connecticut for all the moneys received by the executors in New York and elsewhere, prior to taking out letters testamentary in New York, and to the Surrogate of New York only for the income of the leasehold houses, and of the insurance stock, and for the proceeds of the sale of the houses; and as to the question upon the construction of the will, that he had been advised that it belonged to the courts of Connecticut to determine it, and he had accordingly com-menced proceedings in the Superior Court of that State, to which the legatees were made parties, and of which they had received notice. He annexed a copy of his petition to the Superior Court to his answer, and stated that if no delay was interposed, the question might be settled by the highest court in that State in September then next. He also presented copies of the inventory returned to the Court of Probate, and of all his account rendered to that court. He admitted that ne had on hand in cash securities and money $132,727.17. It appeared that he had paid out for the support and education of the legatees during their minority, $12,739.38, and to three of them who had come of age the specific payments directed by the will, amounting to the sum of $40,000. It was admitted that no claim had been made upon the executors in behalf of the legatees for any amount beyond these payments, until the 15th of January, 1857, when the objections were put in.

The Surrogate refused to suspend the proceedings until the decision of the courts of Connecticut upon Mr. Lyman's suit could be had; and on the 26th of December, 1857, he made a decree or sentence to the following effect: That the executors were bound to account to him as Surrogate for the assets realized from persons and firms residing in the city of New York, whether the same were received before or after the granting of letters testamentary in this State; that besides the specific payments provided for by the will, the legatees were entitled to receive the net income of their respective shares: in other words, that the payments were to be made from the principal, in addition to which they were entitled to the interest, but that they could only claim in his jurisdiction the

income of that part of the estate which had been realized here. He thereupon settled the account as follows: The amount of assets received in New York he set down at $103,078.50, from which he made certain deductions for depreciation, and he also deducted the proportion of the debts and of the specific payments which had been made to the legatees, which the assets collected in New York bore to all the assets, which left a balance of assets subject to his jurisdiction of $70,223.96. Of this he reckoned that $27,543.36, was income, and he directed that sum to be immediately paid to the legatees, stating the amounts payable to each; and he directed the balance of principal to be kept invested, and the income to be paid to the legatees in the proportions in which they were entitled upon the principles of his decree, and that the principal should be disposed of in the manner directed by the will. There was a question whether the legatee, Joseph H. Parsons, could be paid $20,000 every two years, or only $10,000. The Surrogate construed the will to mean that the executors, in their discretion, might pay him at the rate of $10,000 a year, and decreed accordingly.

Both parties appealed to the Supreme Court; the executor, Mr. Lyman, from that part which overruled the positions taken by him, and the legatees from the portions which limited the payment of income to such as accrued from assets realized in New York.

The Supreme Court held with the appellant, Lyman, as to the alleged liability to account for the moneys voluntarily paid to the executors by debtors in New York before the taking out letters testamentary in that city, deciding that he was to account in this State only for the income of the leasehold houses, and of the insurance stock after the taking out of letters testamentary here, and for the proceeds of the sale of the houses and for the stock; and it also held that by the true construction of the will the legatees were only entitled to the biennial payments mentioned in the will, and were not entitled to be paid the income upon the balance of the capital. The court dismissed the cross-appeal of the legatees. There was an appeal by the

legatees to this court from the judgment of the Supreme Court. Mrs. Parsons, the executrix, also appealed from that judgment, except from the part which dismissed the cross-appeal by the legatees from the Surrogate's decree.

The printed case contained an authenticated copy of the proceedings in the Superior Court and in the Supreme Court of Errors of Connecticut upon the petition of Mr. Lyman. The petition asked for a construction of the will for the guidance of the executors, upon the question whether the children and legatees were entitled to be paid the income of their respective shares of the fund in addition to the specific payments; and those legatees and the husband of Elizabeth and the widow and executrix were made respondents. Mrs. Parsons, the widow, was personally served, but as to the others the service was by notice sent by order of the court by mail to their place of residence in this State. It was admitted that there was no other service upon the legatees, but that they had actual knowledge of the proceedings. The court appointed a guardian *ad litem* for Caroline, the minor. Mrs. Parsons appeared by Mr. Stanley as her attorney, but the other respondents made default. The Superior Court proceeded to ascertain the facts, and then referred the questions of law for the advice of the Supreme Court of Errors. That court, after hearing arguments by the counsel for the petitioner and for the widow, gave its opinion and advice that the income of the estate, after paying the widow's annuity, should be kept invested, and that the payments to the legatees should be such only as were specified in the will. The Superior Court at the December term in 1857, pronounced judgment to that effect; the certificate attached to the papers bearing date on the 4th day of that month. The Surrogate's decree appears to have been entered on the 26th day of the same month; but no reference is made to the Connecticut judgment in the decree or in the Surrogate's opinion.

The case was argued here by

*David Dudley Field* and *C. C. Langdell*, for the appellants.

*Hiram Ketchum*, for the respondent.

Parsons *v.* Lyman.

DENIO, J.   It is an established doctrine, not only of interna‧ tional law but of the municipal law of this country, that personal property has no locality.   It is subject to the law which governs the person of the owner, as well in respect to the disposition of it by act *inter vivos*, as to its transmission by last will and testament, and by succession upon the owner dying intestate. (*Story's Conf. of Laws*, §§ 376–383, *and cases in the note to* § 380; 2 *Kent Com.*, 428, 429; *Holmes* v. *Remsen*, 4 *John. Ch.*, 460; 4 *Cow.*, 517, *note; Shultz* v. *Pulver*, 3 *Paige*, 182; *S. C.*, 11 *Wend.*, 363; *Vroom* v. *Van Horne*, 10 *Paige*, 549.) The principle, no doubt, has its foundation in international comity ; but it is equally obligatory, as a rule of decision in the courts, as a legal rule of purely domestic origin.   It does not belong to the judges to recognize or to deny the rights which individuals may claim under it, at their pleasure or caprice ; but, it having obtained the force of law by user and acquiescence, it belongs only to the political government of the State to change it whenever a change becomes desirable.   But the right which an individual may claim to personal property in one country, under title from a person domiciled in another, can only be asserted by the legal instrumentalities which the institutions of the country where the claim is made have pro‧ vided.   The foreign law furnishes the rule of decision as to the validity of the title to the thing claimed ; but in respect to the legal assertion of that title it has no extra territorial force. As a result of this doctrine it is now generally held every- where, and it is well settled in this State, that an executor or administrator appointed in another State has not, as such, any authority beyond the sovereignty by virtue of whose laws he was appointed. (*Morrell* v. *Dickey*, 1 *John. Ch.*, 153 ; *Doolittle* v. *Lewis*, 7 *id.*, 45 ; *Vroom* v. *Van Horne*, *supra.*)

But if residents of this State have in their possession property which belongs to a party domiciled abroad, or are indebted to him, they may of course recognize any valid title claimed under him, arising out of an act *in pais*, by testament or by succession upon intestacy, and may voluntarily deliver over the property or make payment of the debt.   Our jurisdiction

is not violated nor our tribunals in any respect contemned by such a transaction. Simply, our laws are not invoked because in the case supposed there is no occasion for their agency. If the property or money is thereupon taken by the new possessor into the foreign jurisdiction we have no further concern with the matter. If the claimant whose demands have thus been conceded, is himself a trustee for others, as in 'the case of an executor or administrator, he is subject to the same legal pursuit by the parties whom he represents, or who are interested in the trust, as though he had received the assets at the domicil of the former owner. The fact that those assets were at one time within our jurisdiction, or had existed in the shape of a debt owing by a resident of this State, is of no legal consequence. In stating this position I of course exclude any consideration of cases where a lien by way of attachment or otherwise had been fastened upon the property, or where any claims of a domestic executor or administrator had attached to it before it had passed into the hands of the party claiming under the foreign title. I might also exclude the case of beneficiaries of a trust residing in this State, as legatees or creditors of a testator whose executors appointed in another State had come here and received, by voluntary delivery or payment, the personal assets of the estate; for in the case before us the respondent received in Connecticut, and invested, the moneys for which he has been adjudged liable to account to the Surrogate of New York, while every person interested in the estate was a resident of the State of Connecticut. But if that were otherwise I conceive that it would make no difference. It was the duty of the debtors to pay what they owed the testator, to him while living, and according to his appointment after this death. By a testamentary act, perfectly valid everywhere, he appointed the respondent to receive these moneys. The legatees were in no privity with the debtors of the estate in New York or elsewhere. They could only claim through the respondent as executor. In the absence of any administration in this State, payment could only be made to the executor appointed in Connecticut, and if all the creditors and legatees had resided here, it would have

been impossible for them to have prevented the payment to the executors, except by attaching the debt under a local law, or by themselves procuring administration here.  These positions seem to me to flow so naturally from conceded principles that I should feel quite confident of their correctness, if they were not recognized by any adjudged case.  But they have been repeatedly recognized.  In *Atkins* v. *Smith* (2 *Atk.*, 63), Lord Chancellor HARDWICKE, declared that ecclesiastical jurisdictions were limited within their particular districts, and that an administration taken out in England would not extend to the Colonies in America; but he said that if an executor sends over an exemplification of a probate to Maryland or any other colony, the person who is employed as an agent there by the executor may, by letter of attorney from him, collect in the effects of the testator, and is chargeable as much as if he, the executor, had got them in himself.  In *Williams v. Storrs* (6 *John. Ch.*, 353), Chancellor KENT expressed the opinion that a voluntary payment by a debtor here to a Connecticut administrator would be good.  In *Doolittle* v. *Lewis* (*supra*), he repeated the same opinion.  In deciding that foreign administrators could enforce a power of sale contained in a mortgage to their intestate upon lands in this State, he inquired, "can they not give a voluntary discharge of a mortgage without clothing themselves with the office of an executor or administrator under the judicial authority of this State?  And is not the policy of the law sufficiently answered when our courts refuse to lend their assistance to any authority not derived from our own laws touching the administration and distribution of assets?  If the parties can transact their own business according to their own agreement without asking the aid of our courts, why may they not lawfully do it?"  It was unnecessary to decide the point in either of these cases; but in *Shultz* v. *Pulver* (*supra*), which was affirmed in the Court of Errors, an administrator appointed by the Surrogate of Columbia county was compelled to account for and was charged with the amount of a debt owing to his testator by a solvent debtor residing in Pennsylvania, on account of a neglect to use due diligence in

obtaining payment. In *Vroom* v. *Van Horne* (*supra*), Chancellor WALWORTH stated that the result of the cases in this State seemed to be that a foreign executor or administrator appointed by the proper tribunal of the decedent's domicil was authorized to take charge of the property here and to receive debts due to the decedent in this State where there was no conflicting grant of letters here, and where it could be done without suit. The same principle is stated as good law by Judge STORY, in *Trecothick* v. *Austin* (4 *Mason*, 33), though rather by way of illustration than as a point adjudged.

Assuming then that the respondent was justified in collecting in the moneys due the estate by New York debtors, so far as he was able to do it without suit, I do not see how it is possible to state any distinction between the assets thus realized, after they were so realized, and the assets which, at the death of the testator, were situated in Connecticut. The respondent was accountable for the whole to the Probate Court in Connecticut, and it would be exceedingly preposterous for him to set up any exemption from accountability, arising out of the circumstance that the moneys had been paid by debtors residing in another jurisdiction. When the moneys were paid, and for many years afterwards, there was no person residing in New York who had even the smallest interest in them. By the general rules of law the debts thus converted into money had no locality other than that of the creditor's domicil, in Connecticut; and when they had been thus converted and the avails had been brought into the jurisdiction of the creditor's domicil, their origin and former history became immaterial, as I conceive, for any purpose whatever. Besides, they were not only brought into Connecticut, but were placed under the control of the Probate Court of that State. The annual accounts rendered by the respondent to the court, by which he reported the manner in which the moneys were invested, and the action of the court in accepting and allowing his repeated accounts and schedules, was the exercise of the jurisdiction of the court respecting them, as full and complete as though the moneys had been paid into court and had been invested by one of its

officers pursuant to its orders. The idea of subsequently with-drawing them from that jurisdiction and subjecting them to the jurisdiction of the Probate Court of New York appears still more unreasonable when we consider, what is admitted on all hands, that the construction of the will, and the respective titles, rights and duties of the executors and of the legatees, must be ultimately determined according to the law of the tes-tator's domicil, namely that of the State of Connecticut. If the administration of these assets is to be conducted under the orders of the Surrogate of the county of New York, still the rule of decision is the law of Connecticut, which the New York court must ascertain by proof and apply by its judgments. Clearly, the jurisdiction should not be transferred from the country of the testator's domicil to New York, unless it is required by some imperative rule of law. I feel confident that it is not required or permitted by any legal principle whatever.

But it is said that the executors have voluntarily submitted these assets to the jurisdiction of the Surrogate's Court by apply-ing for and taking out letters testamentary in New York, and by subsequently asking for the settlement of their accounts before the Surrogate. But it is certain that this was not the intention of the executors, and the acts themselves do not naturally look to any such results. There were assets yet remaining in New York, namely, the leasehold houses and the insurance stock. These presented a legal occasion for the executors' cloth-ing themselves with probate authority in this State, quite independent of any consideration relating to the realized assets which they were administering under the authority of the Pro-bate Court in Connecticut. Having converted the leasehold estates into money and securities, it became necessary for them to account before the Surrogate in respect to that portion of the estate. When they applied for the citation, the reasonable inference surely is that they designed to adjust the matters which were properly cognizable before the Surrogate, and not those to which his jurisdiction did not extend; and when, on the returns of the citations, which was their first appearance in the Surrogate's Court, they brought in their accounts, the nature

Parsons *v.* Lyman.

of the proceeding became quite apparent. Those accounts were limited to the leasehold houses and the insurance stock, and there was no reference to any other portion of the estate.

The nature of this second administration and its relation to the primary administration in Connecticut will be subsequently adverted to; but at present it is enough to say that the Surrogate's letters did not confer on the New York court any jurisdiction over the assets which were in the course of administration under the orders of the Connecticut court. It has already been shown that there was no difference, as to the probate jurisdiction, between the money realized before the taking out of letters here from New York debtors and that which arose out of property originally situated in Connecticut. The Surrogate did not consider that the New York letters gave him jurisdiction over the latter, for he disclaimed any interference with what he considered properly Connecticut assets, and limited himself to disposing of the portion of the general assets which had been paid by debtors residing here, and the leasehold houses and insurance stock. In this disclaimer he was clearly right. Suppose a person dying here to have assets in several States of the Union—a case which may often happen—administration taken out here would not be recognized in the other jurisdictions, and it might therefore be necessary for the administrator, by himself or by his agents, to take out letters in several other States. Under what authority the assets realized under these subordinate administrations should be finally distributed may be questionable; but certainly no one will contend that the fact of taking out letters, for instance in Texas, for the collection of a small debt there, would confer upon the Probate Court of that State the administration of the assets realized here at the place of the domicil of the intestate. The true rule is that the executor is liable to account in each jurisdiction where he receives his authority, for the assets collected by virtue of that authority. (*Story's Conf. of Laws*, § 513.)

I think it very plain from these considerations that the Surrogate fell into an error in assuming to make a decree for the

distribution of the assets realized and placed under the juris-diction of the Court of Probate in Connecticut long before the executors applied for letters testamentary in this State. He had no jurisdiction except as to the income and proceeds of the leasehold property and the insurance stock. This would lead to the simple reversal of the Surrogate's decree, so far as it was appealed from by the present respondent; for it is impossible to separate the directions given in it respecting the Connecticut assets, of which he had no jurisdiction, from those to which his jurisdiction extended.

But upon the record being remitted to his court, the Surro-gate will be called upon to make a decree for the disposition of the money and securities in the hands of the executors arising out of the leasehold houses and the insurance stock. The posi-tion of the respondent is that in stating the account of these assets he is entitled to carry the balance in his hands into his accounts with the estate as administered under the direction of the Probate Court of Connecticut, so that, his administration in this State being thus closed, the estate shall be thenceforward administered as an entirety under his first appointment in Connecticut. The appellants on the other hand maintain that no such transfer can be made, but that the Surrogate must continue to exercise his jurisdiction over this portion of the assets until the administra-tion is finally closed. The determination of this question would, as a practical matter, involve only considerations of economy and convenience, were it not for the difficulty which has arisen upon the construction of the will, as to which it is possible that the courts of the respective States may eventually hold different opinions. The question of construction does not appear to depend upon any local laws of the two States, for if it did, it is conceded that the law of Connecticut must govern; but it depends rather upon the interpretation of the language of the will, the principles of law applicable to the instrument being mainly, though not entirely, the same in both States. It does not necessarily follow because the Connecticut law must furnish the rule, that the courts of that State only are competent to pass upon the question; for it frequently happens

Parsons *v.* Lyman.

that the right to money or property in litigation in the courts of one State is to be determined by the law of another. If, however, the solution of the question as to the proper court for administering these New York assets, depends upon the special circumstances of the case, and is in any respect a matter of judicial discretion, then the consideration that the law of the domicil is the one to be applied, affords a reason of some weight in favor of remitting the question to the courts of the government where that law is the one habitually administered. It is also to be borne in mind that there are no creditors of the estate in this State or elsewhere, and that though the legatees have now a residence here, they were all, when the trust was created by the death of the testator, and for many years afterwards, domiciled in Connecticut, and that they have since come here voluntarily. The other facts bearing upon the question are, that in any event the greater portion of the estate is to be administered in Connecticut, the amount of the assets there being about five-sixths of the whole; that the executors, one of them being also a beneficiary, resided there at the making of the will and have continued to do so. The legatees must necessarily remain suitors of the Connecticut Court of Probate in respect to the greater part of their interest in the estate. The appellants are residuary legatees, and the amount constituting the residue must always depend upon the allowance to be made to the executors for losses and expenses, as to which it is certainly possible that the two probate tribunals may differ in their judgments. These considerations, and the general propriety and manifest convenience of a unity of judicial supervision in respect to a matter essentially entire and indivisible, would lead me to adopt the respondent's views if consistent with the rules of law.

The general provisions of the Revised Statutes, relative to the returning of inventories, the accounting of executors and administrators, and enforcing the payment of debts, legacies and distributory shares, do not contemplate the administration of a part of an entire estate, the residue of which is subject to the control of some other probate tribunal. For instance, the

inventory is to embrace an account of all the assets of the deceased without any exception; the accounting is to be of the assets generally; the entire indebtedness of the deceased is to be paid; and the whole estate is to be distributed among creditors, legatees, widow and next of kin, according to their respective rights; and the Surrogate is to settle and determine all questions concerning any debt, claim, legacy, bequest or distributive share, to whom the same shall be payable, and the sum to be paid to each person. So the distribution of property not bequeathed is to be made according to certain rules of succession, which may differ widely from those which obtain in other States. (2 *R. S.*, 82, § 2; *id.*, 84, §§ 11, 12, 16; *id.*, 87, § 27; *id.*, 92, §§ 52, 54; *id.*, 93, § 60; *id.*, 95, §§ 70, 71; *id.*, 96, § 75.) I do not doubt but that these provisions could be accommodated to the case of separate administrations of the same estate under different governments if absolutely necessary, though they refer in terms to domestic administration of an entire estate; but they show that it was not within the contemplation of the Legislature that a case could arise where an estate would be subject to two probate jurisdictions. Under the direction to determine all questions respecting an alleged debt or legacy, a conflict between the two jurisdictions might naturally arise. In the case before us there is a question of considerable difficulty upon the construction of the will, whether the executors have a discretion to pay Joseph H. Parsons $20,000 every two years, or only $10,000; and upon this point the Supreme Court of Errors in Connecticut and the Surrogate here entertain different opinions. The Surrogate would, no doubt, feel bound to decree payment according to his construction of the will, so far as the assets under his control should extend, while the Connecticut Court of Probate, acting under the construction established by the highest court in that State, might very probably consider this an over-payment, and withhold the amount supposed to be overpaid from the next biennial payment. So the last mentioned court might consider the payment of interest, which the Surrogate would judge it his duty to order, as legally applicable to the fixed payments

directed by the will, and order the future installments to be diminished accordingly. I need not enlarge upon the inconveniences and embarrassments which would be likely to arise out of this double jurisdiction over the same estate; for if by law the assets are necessarily to be administered in this way they must be encountered as they best may.

But I am of opinion that the Surrogate may, and that in this case he ought, after having adjusted the accounts of the executors, and ascertained the net amount of New York assets with which they are chargeable, to remit the jurisdiction in respect to future directions to the Court of Probate of Connecticut. The only provisions of the statute in any way affecting the question is that which authorizes a Surrogate to recognize and issue letters testamentary upon a foreign will upon the production of an authenticated copy of it under the seal of the foreign court before which it was proved, and the one which declares that where a will has been made by a person not domiciled here but leaving assets in this State, and letters testamentary or of administration have been granted upon it by competent authority in any other State of the United States, the person so appointed, on producing letters, shall be entitled to letters of administration here in preference to any other person except a relative entitled thereto and except the public administrator of the city of New York. (2 *R. S.*, 67, § 68; *id.*, 75, § 31.) It is apparent from this that the Legislature contemplated that in certain cases the same person might be an executor or administrator under the laws of another State where the deceased was domiciled at his death, and also, as to assets here, under the laws of this State. It also appears that a discrimination was made in favor of the Probate Court of a sister State of the Union, over those of a foreign country; for the recognition of other letters testamentary is limited to such as had been issued by competent authority in one of the United States. The effect of letters issued here to an executor or administrator producing similar authority from another State is not declared in the statute, nor do I find that the courts of this State have ever been called upon to pass upon such a question. Chancellor WALWORTH speaks of

such letters as *ancillary* to those issued by the courts of the testator's domicil. (*Vroom* v. *Van Horne, supra.*) No doubt such letters confer the usual power to reduce the assets to possession, and clothe the Surrogate and court with authority to call the executors or administrators to account, and to make a decree for the disposition of assets. It does not however follow that, in the case of an executor, the power simultaneously existing in the Probate Court of the testator's domicil is to be lost sight of, or that the dispositions of the will must be fully executed here to the extent of the effects realized under the Surrogate's letters. The only adjudications which I have found bearing directly upon the question are those in the Supreme Judicial Court of Massachusetts, and the Circuit Court of the United States sitting in that State. In the *Selectmen of Boston* v. *Boylston* (2 *Mass.*, 384), it was held that one who had taken out letters testamentary in England as executor of the will of a person domiciled and dying there, and had afterwards proved the will in Massachusetts—which by statute of that State was equivalent to letters of administration— was not bound to account in Massachusetts for assets received in England. The case came before the court again, and although the point then decided is not important here, it was said in stating the grounds of their decision that the administration in Massachusetts was to be considered not only as a means of collecting the effects of the testator within that jurisdiction, but of answering according to the rules of the same jurisdiction the demands of creditors and all legal liens upon those effects. The town of Boston was the residuary legatee under the will in question, which was that of Thomas Boylston. The court added that the Selectmen of Boston had therefore a direct and immediate interest in the account of the administrators, and in any process which could be instituted to determine the amount of the effects collected and the charge to which they were justly liable; or in other words in ascertaining the residuum of the testator's effects within that jurisdiction. The general question next came before the court in *Richards* v. *Dutch* (8 *Mass.*, 506). The plaintiff was an administrator with the will annexed of one

Murray, who was domiciled at Calcutta, where he died. He took out letters of administration in Massachusetts, and sued the defendant for the avails of goods consigned by the testator to him in that State. The defendant set up that he was a legatee under the will of the testator of the very property for which he was prosecuted. This depended upon certain language in the will by which the testator gave certain property which he had sent to America, to the persons to whom he had sent it, in general terms; and the question was whether the defendant and the property which he claimed to hold were embraced in that language. There was a verdict for the defendant, which the court set aside; and one of the grounds of the judgment was that in the case of administration in Massachusetts on a foreign will, "the administrator may be held to pay debts due to creditors here if any such are claimed of him; but legatees who claim only from the bounty of the testator must resort to the country of the testator where the will was originally proved and by the laws of which his effects were to be distributed." The controversy upon the will of Thomas Boylston came before the court again in a case reported in 9 *Mass.*, 337, which was an action on the bond taken upon granting administration in Massachusetts, and was prosecuted for the benefit of the town of Boston as residuary legatee under the will. The question now under consideration was directly involved, as the court were called upon to declare whether the bond was forfeited, and if it was what should be the amount for which execution should issue. It was held that the administrator was bound to account and to pay the domestic debts, if any, but that he was not compellable to pay the legacy to the town of Boston or any part of it. The court say, "the rights of legatees, especially of residuary legatees, as well as the next of kin in the case of intestacy, depend upon the laws of the country where the deceased had his home and domicil from whom the bequest or succession is claimed, and for that purpose all the choses in action and personal effects are to be deemed local, and to be there accounted for and finally administered, wherever collected or accruing to the executors or administrators. The administration granted

within this State has been justly styled ancillary in respect to the administration in the Prerogative Court.  The defendant has an authority to collect and pay debts, and is liable for the contracts and debts of the testator recoverable and which may be enforced within this jurisdiction; but he is not liable in the Court of Probate, upon any partial account to be there rendered and adjusted to a decree either of payment or of distribution, whether for a legacy or to one claiming by a supposed succession of the deceased's effects."  The court held that the defendant was liable to render an account of the effects realized by him in Massachusetts, and was not bound to do anything more.  The case has additional weight on account of the fact that the residuary legatee was a Massachusetts municipality, and that the testator must have contemplated that the legacy would eventually be paid here.  If those legatees had been Englishmen domiciled in England at the testator's death, and had afterwards come to Massachusetts, the case would have been parallel with the one now before the Court.

The same principle was recognized in *Fay* v. *Haven* (3 *Metc.*, 109, 114).  A person domiciled in Louisiana made his will there, appointing executors who took upon themselves the administration, and one of them afterwards came to Massachusetts and took out administration there.  The court said that the administration in Massachusetts was merely ancillary, and the only duty devolving upon the administrators would be to collect the debts here and appropriate so much of the avails of same to the payment of the debts due to the citizens of Massachusetts as would be authorized by the general solvency or insolvency of the estate, and remit the balance to the place of the principal administration.  See also *Jennison* v. *Hapgood* (10 *Pick.*, 77), and *Dawes* v. *Head* (3 *id.*, 128).  In the last case the court say that possibly the assets collected under the ancillary administration might be directed to be paid to legatees living in the jurisdiction of such administration, unless the circumstances of the case should require the funds to be sent abroad.

Judge STORY, in the interesting case of *Harvey* v. *Richards* (1 *Mason*, 380), has examined the question with very great attention. He considers it to be well settled in Massachusetts in the way I have mentioned, but that it is limited in its application to the Probate Courts and does not extend to suits in equity brought in the Federal Courts in that State. And it is proper to say that he does not approve of the extent to which the doctrine has been carried even in respect to the Court of Probate. He considers the correct rule upon principle in all courts to be this: that whether the court, which is not that of the testator's domicil, but in which administration has been subsequently obtained, ought to decree distribution or remit the property abroad is a matter not of jurisdiction, but of judicial discretion depending on the particular circumstances of each case; that there ought to be no universal rule on the subject; but that every nation is bound to lend the aid of its own tribunals for the purpose of enforcing the rights of all persons having title to the fund, when such interference will not be productive of injustice, or inconvenience, or conflicting equities. The case before him was a bill in equity in the Circuit Court of the United States in Massachusetts. It was a case under the same will mentioned in *Richards* v. *Dutch*, the primary administration being in Calcutta. The property, which was the subject of the suit, had been sent by the testator to Boston; and it was not embraced in the will made in Calcutta but was personal property unbequeathed, and was not a residue. The next of kin resided in Massachusetts, and the administrator in that State was a different person from the executor in Calcutta. Distribution to the next of kin was decreed.

I have come to a conclusion, in accordance with the views of Judge STORY, that whether the funds realized here, after the payment of domestic debts, ought to be left in the hands of an executor appointed by the Probate Court of the testator's domicil in a sister State, to be fully administered under the order of that court, should depend upon the special circumstances of each case; and that in the case now before us the considerations which have been adverted to forbid the Surrogate to

attempt to execute the trusts of the will in this jurisdiction; that after settling the accounts of the respondent, the latter should be allowed to administer all the assets of the estate under the direction of the court in Connecticut, from which he received the first letters testamentary. We are not therefore, I think, called upon to pass upon the questions of construction arising upon the will, but we leave them to the court whose duty it thus becomes to decide all questions regarding the distribution of the moneys of the estate.

The effect of the judgment of the Supreme Court is to reverse the whole of the Surrogate's decree appealed from by Mr. Lyman, and to require the executors to account for the assets realized in New York after the issuing of letters testamentary here. The views expressed in this opinion will be accomplished by a general judgment of affirmance of the judgment of the Supreme Court. What has been said respecting the principles upon which the account is to be taken and the disposition of the net balance of the New York assets, will no doubt be conformed to in the future proceedings before the Surrogate. The costs of both parties in this appeal are to be paid out of the trust fund.

All the judges (except SELDEN, J., who was absent) concurring,

Judgment affirmed.