WILLIAM MILLER, APPELLANT, v. CHRISTINA MILLER
AND OTHERS, RESPONDENTS.

"*Illegitimate children*" *in section* 19 *of* 1 *R. S.*, 754 — *means those not born in lawful wedlock* — *right to inherit depends on the law of the place where land lies* — *U S. Const., art. 4, sections* 1 *and* 2.

The term "illegitimate," as used in section 19 of 1 Revised Statutes, 754, providing that "children and relatives who are illegitimate shall not be entitled to inherit under the provisions of this chapter," is t receive its common law signification, and means begotten and born out of lawful wedlock. (LEARNED, P. J., dissenting.)

In 1845 the plaintiff was born at Wurtemberg, of parents who were citizens of that kingdom, and were then unmarried. By the laws of that kingdom antenuptial children are legitimated by the subsequent marriage of their parents. In 1853 the plaintiff and his parents moved to the State of Pennsylvania, and in June of that year his parents there lawfully intermarried; they and the plaintiff resided in Pennsylvania until 1860, when they all removed to Elmira, in this State, and there resided until the death of the mother in 1873, and of the father in 1875. The father was married again after the death of plaintiff's mother. The father was naturalized in 1858.

By an act of the Legislature of Pennsylvania, passed in 1857, antenuptial children were legitimated by a subsequent marriage of their parents, and by an act passed in 1858, the former act was made applicable to cases occurring before its passage. The plaintiff sought to recover real estate in Elmira, owned by his father, who died intestate, leaving him surviving a widow and brothers and sisters.

*Held*, that the right of the plaintiff to inherit was to be determined solely by the laws of this State.

That having been begotten and born out of lawful wedlock he was an illegitimate child, as that term is used in the statute of descents of this State.

That neither the first section of article four of the United States Constitution, requiring full faith and credit to be given in each State to the public acts of every other State, nor the first clause of the second section of the fourth article thereof, providing that the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States, required such effect to be given to the statutes of the State of Pennsylvania as would enable the plaintiff to inherit land in this State.

APPEAL from a judgment in favor of the defendants, entered upon the report of a referee. The action was in ejectment to recover certain real estate situated in Elmira, in this State, to which the plaintiff claimed to be entitled as heir-at-law of his father, who had died intestate. The sole question involved was as to the

legitimacy of the plaintiff, he having been born at Wurtemberg before the marriage of his parents.

By the statutes of the kingdom of Wurtemberg, antenuptial children are legitimated by the subsequent intermarriage of the parents, and inherit in that event the same as children born in lawful wedlock. (§ 4, tit. 17, Laws 1610.)

In July, 1845, the plaintiff was born at Wurtemberg. His parents were unmarried and citizens of that kingdom. In 1853 the plaintiff and his parents became residents of the State of Pennsylvania. June 28, 1853, the parents lawfully intermarried in that State, and there lived as husband and wife until 1860. They then moved to Elmira, where they continued to reside together until the death of the wife in 1873. Thereafter the father remarried and died in 1875 intestate, and leaving his second wife and brothers and sisters him surviving. In 1858 the father became a citizen of the United States by naturalization.

By an act of the Legislature of the State of Pennsylvania, passed May 4, 1857, antenuptial children are legitimated by the subsequent marriage of their parents, and are entitled to all the rights and privileges of children begotten or born in lawful wedlock. By an act of April 21, 1858, the foregoing act of May 14, 1857, was made applicable to cases occurring before, as well as after May 14, 1857, unless some interest had become vested. At the time of the passage of these acts the plaintiff and his parents were residents of the State of Pennsylvania. The intestate's widow and brothers and sisters are in possession of the lands of which the father died seized ; and for the recovery of which this action was brought. This action was tried before a referee, who ordered judgment for the defendants, from which the plaintiff appealed.

*Robert Stephens*, for the appellant.

*John A. Reynolds*, for the respondents.

FOLLETT, J. :

In cases of intestacy personal property is distributed according to the law of the place of the domicile of the intestate. (*Parsons* v. *Lyman*, 20 N. Y., 103, 112; *Moultrie* v. *Hunt*, 23 id., 394;

Story's Conflict of Laws, § 380.)  But real estate in such cases descends according to the law of the place where it is situated. (*White* v. *Howard*, 46 N. Y., 144–159: Story's Conflict of Laws, § 424.)

These rules are elementary and control wherever the common law prevails, and in nearly every civilized country.  All independent governments exercise without dispute the right to specify by enactment the class of persons who may own lands within their territories, and to define the modes by which title to lands may be acquired and transmitted.  This right is necessarily exclusive. Were other governments permitted in the least degree to prescribe the persons who may acquire title to real estate, and the methods by which title may be transmitted, inextricable confusion would ensue.

By the statutes of this State illegitimate children and relatives are not entitled to inherit real estate.  (1 R. S., 754, § 19.)

Words and terms having a precise and well-settled meaning in the jurisprudence of a country are to be understood in the same sense when used in its statutes; unless a different meaning is unmistakably intended.

The word "illegitimate," when used in this connection, has by the common law, and the law of this State, a well defined meaning, which is, begotten and born out of wedlock.  (1 R. S., 641, § 1; 2 Kent's Com., 208–209; 1 Blackstone's Com., 454–455.) This has been the meaning of the word since the common law was reduced to writing.  This statute, read in this light, means that children begotten and born out of wedlock shall not inherit lands in this State.

For most purposes, each sovereignty may fix the status of its citizens, which continues wherever they are subsequently domiciled; but the status so fixed cannot confer rights repugnant to the laws of the country of adoption.  The Legislature of a State may create the legal relation or status of parent and child between persons in no wise related.  This has been frequently done by special laws.  Several States have statutes permitting the adoption of strangers, which being done, the two sustain to each other and to all within that State, the legal relation of parent and legitimate child ; but if the two should become residents of this

State, and the parent by adoption die intestate possessed of lands, the child by adoption would not inherit under our statutes.

It is said that the cases are not parallel, because an adopted child is not a "lineal descendant," and, therefore, not within our statutes of descent. This is true, if the term refers to the circumstances of birth instead of to a legal status which may be established by law. If the word "illegitimate" in the statute of descents refers, as we think we have heretofore shown, to the circumstances of birth, the two cases are parallel, and if the statute of another State can subvert our statute regulating the descent of real property in the one case, it can in the other. In other words, if the statute of another State can make an heir to lands in this State out of a person not possessing the physical qualities of legitimacy required by our statute, an heir can be so made out of a person possessing none of the physical qualities of a lineal descendant.

A foreign statute, or a status created by it, does not control our statutes regulating the descent of real property. But we are not called upon to elaborately discuss this question, it having been exhaustively done in the King's Bench and House of Lords. (*Birtwhistle* v. *Vardill*, 5 B. & C., 438; id., 9 Bligh., 32; id., 2 C. & F., 571; 7 id., 817.) In this case it was held that an antenuptial child born in Scotland, of persons domiciled there, could not inherit lands in England, though by the law of Scotland the child had been legitimated by the subsequent intermarriage of the parents. The rule laid down in this case has been uniformly followed in England. (*Don's Estate*, 4 Drewry, 197; *In re Wright*, 2 K. & J., 595; *Shaw* v. *In re Gould*, Wilson's Trusts Law Rep.; 1 Eq. Cases, 247; Law Rep., 3 H. L., 55.)

It is urged that the decisions of the English courts are founded upon the statute of Merton, enacted at the priory of Merton, in Surrey, in the year 1236.

For centuries the ecclesiastics endeavored to subvert the law of England regulating the legitimacy of children, and introduce in its stead the canons of the church. During the reign of Henry II, Pope Alexander III went so far as to assume original and exclusive jurisdiction in cases involving legitimacy, and issued a commission to the bishop of Winton and Exon to inquire if the mother of one Robert de Ardenna was legitimate, and if

so, to restore to said Robert certain lands. It was urged in behalf of the king that Christ refused to entertain such a case upon a petition made to him. "Master, speak to my brother that he divide the inheritance with me. And he said unto him : Man, who made me a judge or a divider over you ?" (Luke 12, 13 and 14.) The jurisdiction asserted was successfully resisted, on the ground that temporal courts had exclusive juris-diction over temporal inheritances. (Davies' Reports, title of Legitimation.) But it may well be doubted whether the text cited exercised as much influence on the result as the temporal power of that vigorous and stubborn monarch.

Before and during the reign of Henry III, if it was alleged that the person claiming as heir was illegitimate, a writ was issued to the archbishop, or bishop, commanding that inquiry and return upon this issue be made to the king or his justices. (1 Reeves' Hist., chap. 3, 168.) By the canons of the church, and the rule of the Roman law, the subsequent intermarriage of parents legiti-mated antenuptial children, and the ecclesiastics were inclined to return according to the canons of their church, and contrary to the common law.

At the parliament of Merton the ecclesiastics endeavored to enact the rule of their church, but " all the earls and barons, with one voice, answered that they would not change the laws of Eng-land which had hitherto been used and approved." (1 Black. Com., 19, 456; 2 Kent's Com., 209.) No change whatever was made at Merton ; and, thereafter, the ecclesiastics were required to return the facts, whether the claimant was begotten and born out of wedlock, and judgment was rendered by the courts accord-ing to the common law. (1 Reeve's Hist., chap. 3, 169.)

Bracton, an ecclesiastic, as well as lawyer, who wrote, it is supposed, in the time of Henry III, in discussing the effect of the legitimation of antenuptial children by the subsequent intermarriage of their parents, said : "It follows to consider how the illegitimate are legitimated, and it is to be known, that if any one has natural children by any woman, and after-wards contracts matrimony with her, the children already born are legitimated by the subsequent marriage, and are reckoned fit for all lawful acts, nevertheless only for these which regard the

sacred ministry, but they are not legitimate for those which regard the realm, nor are they adjudged to be heirs who can succeed to their relatives, on account of a custom of the realm, which is of a contrary import." (Chap. 29 f., 63 b. or vol. 1, page 503 of the Lords Commissioners edition.)

It may be safely asserted that the decisions of the English courts rest on the common law.[*] But it is not very material whether they rest on the common law or the early statutes, because the English statutes enacted before the settlement of this State are a part of its common law. (*Bogardus* v. *Trinity Church*, 4 Paige, 198; 1 Kent's Com., 473.)

Prior to the passage in Pennsylvania of the act of May 14, 1857, it was there held that a child begotten and born out of wedlock in another State, and legitimated by the law of that State, could not inherit lands in Pennsylvania. (*Smith* v. *Derrs' Administrators*, 34 Penn. Stat., 126.) The question in the case at bar was not necessarily involved in *Smith* v. *Derrs' Administrators*, because, under the statute of Pennsylvania, at the time the case arose and was decided, only persons born in lawful wedlock and posthumous children were entitled to succeed to real and personal estate. (§§ 13 and 17, act of April 8, 1833; 1 Brightly's Purdon's Digest [10th ed.], 809; §§ 33 and 36, p. 810.) But the doctrine of *Birtwhistle* v. *Vardill* was discussed and fully approved by the court. In *Lingan* v. *Lingan* (45 Ala., 410) an illegitimate son, born and domiciled in France, was legitimated according to the laws of that empire. The father died intestate, seized of real and personal estate, in Alabama. It was held following *Birtwhistle* v. *Vardill* and *Smith* v. *Derrs' Administrators*, that the legitimated child was not entitled to inherit. But a single case has been cited by the counsel, or found by the court, conflicting with the cases above referred to. *Scott* v. *Key* (11 La. Annual, 232) is in direct conflict. In this case, it was held by a divided court, that an act of the Legislature of the territory of Arkansas legitimating an illegitimate child, rendered the child legitimate for the purpose of inheriting lands in Louisiana. But the statute regulating the descent of lands in that State does not exclude, from the list of persons who may inherit, children begotten and born out of wedlock; but, on the contrary, permits

---

[*] Since the above opinion has been in print the attention of the reporter has been called by Judge FOLLETT to the case of *Fenton* v. *Livingston* (5 Jurist [N. S.], part 1, page 1183), to the effect that the statute of Merton is only declaratory of the common law.

them to inherit if legitimated by the intermarriage of the parents and recognition.

*Smith* v. *Kelley* (23 Miss., 167) is not in conflict with the English cases. This was a case of an antenuptial child, born in South Carolina, in which State the parents intermarried, but at that time their intermarriage did not legitimate the child. Subsequently, the three became citizens of Mississippi, where antenuptial children were legitimated by the subsequent intermarriage of the parents. The father died intestate. It was held that the status of the child was fixed by the domicile of its origin; where it was illegitimate, so remained, and could not inherit. If this be law, the plaintiff not being legitimate in the country of his birth, remains illegitimate, unless the intermarriage of the parents in Pennsylvania legitimated the child in the domicile of its origin. Many of the civil law writers hold that the domicile of the origin of a person determines in all other jurisdictions the question of legitimacy. Nevertheless, in our consideration of this case, we have excluded this question and passed upon the rights of the plaintiff as though born in Pennsylvania.

Wheaton, in his treatise on International Law, says : "That as a general rule, a status (citizenship, legitimacy, majority, and the like), acquired by persons in one jurisdiction, attaches to and travels with them wherever they afterwards reside." (§ 84 of the editions by Dana or Boyd.) But, in the succeeding sections, 85–93, he states, among other exceptions to the general rule, that real estate is controlled by the *lex loci rei sitæ*, instead of by the status created by other jurisdictions.

Wharton, in his treatise on the Conflict of Laws, sums up the question in this language : "§ 243*a*. So far as concerns succession to personalty, it has been generally stated, that when a natural son is entitled to succeed by the laws of the father's last domicile, he is entitled everywhere, and that as to the general status of legitimacy, the law of such last domicile is conclusive. But as to land, the limitations of the *lex rei sitæ* must prevail."

Dicey, in his treatise on the Law of Domicile, states the rule in the same way. (Rule 35, pages 181–193.)

Story, in his Conflict of Laws, says : if a person is legitimated in a country where domiciled, he is legitimate everywhere,

and entitled to all the rights flowing from that status, including the right to inherit. This conclusion is reached after an examination and comparison of the conflicting views of the writers upon the civil law, whose writings are extensively quoted in the fourth chapter of the Conflict of Laws. The opinion of the learned commentator is entitled to great respect, but we think ought not to prevail against the authorities above cited, and especially as the writers from whom he quotes are very much in conflict, and he fails to cite any English or American authorities in support of his views. The citation of a few sections would not do the learned author, or the subject, justice. His views, and the reasons for his conclusion, cannot be satisfactorily understood without a thorough examination of chapter 4 of the Conflict of Laws, nearly all of which is relevant to this subject.

The comity existing between foreign States does not require the courts of this State to respect the laws of another State which, in effect, regulates the transmission of real property situate in this State. Nor is the rule changed by reason of the question arising under the laws of one of the United States.

Section 1 of article 4 of the Constitution of the United States provides : "Full faith and credit shall be given in each State to the public acts, records, and judicial proceedings of every other State, and the Congress may, by general laws, prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof." By an act of Congress of May 26, 1790, it is provided that such acts and records, duly authenticated, "shall have such faith and credit given to them in every court, within the United States, as they have by law or usage in the courts of the State from whence the said records are, or shall be taken." (1 U. S. Stat. at Large, 122.)

Madison said in regard to this section of the Constitution (Federalist, No. 42) : "The meaning * * * is extremely indeterminate." Notwithstanding this constitutional provision, and the legislation under it, the Federal and State courts, except in the case of Scott v. Key (11 Louisiana Annual, 232), have uniformly held that the statutes of one State cannot affect the transmission of lands in another State. (Story's Conflict of Laws, §§ 430–431; McCormick v. Sullivant, 10 Wheat., 202; McGoun v.

Scales, 9 Wall., 27.) In McGoon v. Scales it was said : "It is a principle too firmly established to admit of dispute at this day that, to the law of the State in which land is situated, must we look for the rules which govern its descent, alienation and transfer, and for the effect and construction of conveyances."

The first clause of the second section of the fourth article of the Constitution of the United States provides, that : "The citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States." This clause does not embrace and protect rights conferred by a State upon its citizens incident to the marriage contract. Only privileges and immunities pertaining to citizenship are secured by this provision. (Conner v. Elliott, 18 How., 591; Corfield v. Coryell, 4 Wash. C. C. R., 371–380.) Under this clause citizens of other States are entitled to the same rights conferred upon our own citizens, but not to greater or different rights. (Livingston v. Van Ingan, 9 Johns., 507–577; Lemmon v. The People, 20 N. Y., 562.)

Restating the question involved in this controversy, its determination turns upon whether the word illegitimate, in our statute regulating the descent of lands, is to be given its common law signification, or its meaning under the civil law.

The family is the basis of all civilization. In the Roman empire the marital relation was not the exclusive, nor hardly the chief fountain head of the family, and consanguinity was not one of its distinguishing features. Concubinage was recognized, and the head of the family might incorporate in it, strangers in blood, and children born out of wedlock, as well as those born in wedlock. Members of the family so formed were entitled to succeed to the estate of the head, without regard to the ties of consanguinity. Under this system, the word "legitimate," when used in connection with the family, became descriptive of the status of persons, instead of the circumstances of their birth.

The corner stone of the family of English civilization is the marital relation, and consanguinity is its chief distinguishing feature. It is the policy of the common law to make the most tender and important of human alliances permanent, instead of transitory, and to encourage the early union of those who, having formed irregular connections, are capable of entering into the

marriage contract. Permitting the legitimation of children long after their birth, by the marriage of their parents, would not tend to the establishment of families through that relation. This is not the place to draw a comparison between the civilizations founded upon the two systems. Several States have adopted in whole, or in part, the rule of the civil law. But this State has not, and the Legislature of another State cannot thrust it upon us.

We think, until the rule is changed by the Legislature, that the common law meaning of the word " illegitimate " must prevail.

The judgment is affirmed.

LEARNED, P. J. (dissenting):

There is no doubt that the law of this State governs the descent of land therein. That law may direct that the land shall descend in any way which seems best to the legislative power. In fact, the descent of land in this State is regulated not by feudal principles nor by the common law of England, but by our own statutes. Land of an intestate descends first to his lineal descendants. (1 R. S. [m. p.], 751, §§ 1 and 2.) But illegitimate children are not entitled to inherit under any of the provisions of the chapter of descents, (except as this rule has been modified by certain subsequent legislation). (1 R. S. [m. p.], 754, § 19.) The plaintiff is the lineal descendant, the child, of the deceased. Was he legitimate at the time of the death of his father ?

The plaintiff's domicile of birth was the kingdom of Wurtemberg ; of which kingdom both of his parents were subjects. They subsequently became domiciled in the State of Pennsylvania, and his father became a citizen of the United States by naturalization. While they were domiciled in Pennsylvania, and while he was a minor and was there with them, they were lawfully married in that State.

By the law of the domicile of birth, Wurtemberg, and by the law of the acquired domicile, Pennsylvania, the plaintiff was legitimated by this subsequent marriage of his parents. As they were at the time of such marriage domiciled in Pennsylvania, and as he, their minor child, was also domiciled with them there, the law of Pennsylvania declaring him to be legitimate, governs his *status*. The law of the personal *status* must, in the language of Lord

STOWELL, be tried by reference to the law of the country where the *status* originated. (*Dalrymple* v. *Dalrymple*, 9 Bligh, 45.) If two persons contract marriage in the manner which is lawful in the place of their domicile, and where the marriage is contracted, such marriage must be lawful, and the offspring must be legitimate, even in a country where other or additional forms are necessary to the validity of a marriage. (Story Conf. Laws, § 113, and cases there cited.) And the effect of marriage on the *status* of children must be determined by the *lex loci contractus*. (Wharton Int. Law, § 91; Huberus' Conf. Laws, tom 2, lib. 1, title 3, §§ 2 and 3.)

That the *status* of legitimacy arising under the law of one nation is to be recognized by other nations was acknowledged in the strongest terms by the English courts in the very case in which, on other grounds, they refused to permit the legitimated child to inherit.

The case of *Birtwhistle* v. *Vardill* (9 Bligh, 7; 2 Clark & F., 571) involved a question very similar to that here presented. In that case, a son was born of Scottish parentage, in Scotland, before the marriage of his parents; and the parents afterwards intermarried there. By the law of Scotland this marriage legitimated the son. In the opinion given by Chief Baron ALEXANDER, on behalf of the judges, he says: "The comity existing between nations is *conclusive* to give the claimant the character of the eldest *legitimate* son of his father; and to give him *all the rights* which are necessarily consequent upon that character." But he held that the son could not inherit in England, because, *although he was legitimate*, yet he was not born in wedlock. Thus he says: "We have, therefore, considered whether, by the law of England, a man is the heir of English land merely because he is the eldest legitimate son of his father. We are of opinion that these circumstances are not sufficient of themselves, but that we must look farther and ascertain whether he was born in lawful wedlock."

This case was not decided at the time when this opinion was given. It was again argued before the House of Lords, and the opinion of the judges was given by Chief Justice TINDAL (7 Clark & F., 895, at p. 925). He there repeats the views of Chief Baron ALEXANDER, and says that the law of the country where the

claimant was born is allowed to govern his *status* as legitimate. But he says that the maxim of England in respect to the descent of land is that the son must be born after actual marriage; and that this is a rule *juris positivi.* He bases the statement that such is the rule upon the form of the writ issued to the archbishop (Glenville Bk., 7 C., 13), and upon the statute of Merton (Bracton Bk., 5 C., 19). The form of the writ was: "*Eo quod ipsi bastardus sit natus ante matrimonium matris ipsorum.*" (1 Reeves' Hist. by Finlason, p. 168.)

The same arguments and views had been used in the court below. (*S. C.*, 5 B. & C., 438.)

Thus, we have the distinct and repeated assertion of the judges of England that a son, thus legitimated in Scotland, was legitimate in England; and that the reason why he could not inherit was that the English heir must be, not merely legitimate, but born after wedlock. If a statute of England had declared that the eldest legitimate son should inherit, it would seem that the decision of that case must have been different.

The distinction thus made by the English court between one who is legitimate and one who is born in wedlock seems strange. It was criticised by Lord BROUGHAM in that case. But it was made the ground of the decision. And the same view was again taken in the case of *In re Don* (4 Drewry, 197). There it was admitted that the son was legitimated by a subsequent marriage, but it was held that though he was legitimate his father could not inherit from him. And if the highest tribunal in England, with the authority of the English judges also, has thus recognized the effect of a foreign law legitimating a son, we need not cite any other authority on that point.

It should be noticed at this point, that when the common law of England, on the subject of the descent of land, took form, it was hardly possible for the question to arise as to the effect of the law of a foreign country in legitimating a child. Because, generally speaking, it is only the citizens, or subjects, of a country whose *status* is effected by its laws. Persons born out of the king's dominions or allegiance were aliens, and being aliens could not inherit land. (1 Bl. Com., 373.) If, therefore, in the early times, any child had been legitimated by the subsequent marriage of its parents in

a foreign country, it would be hardly possible that such child should be, in other respects, capable of inheriting. Hence it is that the only question which arose in early times was as to the effect of a subsequent marriage in England, and between English subjects. And it was on this point that the barons refused to adopt the rules of the civil law. (1 Reeves' Hist. by Finlason, pp. 168, 299.) It was after the two countries of Scotland and England came to be united that the question, as to the effect of foreign legitimation, arose. And thus too, in the present case, we are brought to meet the question as to the effect of a law of legitimation of a sister State upon those who were subject to its law, and who, at the same time, as citizens of the United States, are not aliens in our State. And, unless we deny to a sister State the right to declare the *status* as to legitimacy of those whose parents are there domiciled and there contract marriage, we must admit that the plaintiff is legitimate here. If legitimate, he inherits.

The case of *Smith* v. *Don, Admr.* (34 Penn. St., 126), is placed on the ground that by the laws of Pennsylvania none can inherit who are " born out of lawful wedlock." It has already been stated that our statute contains no such language.

In *Lingan* v. *Lingan* (45 Ala., 410), the court say that their own statutes provide two modes of legitimation, and that the law does not recognize foreign legitimation. It has already been shown that, even in England, the comity of nations does recognize foreign legitimation. And see Story Confl. (*ut supra*).

In *Scott* v. *Key* (11 Louis. Ann., 232), legitimation by an act of the State of Arkansas was held to entitle a child to inherit.

It is argued that the word "legitimate" means "born in lawful wedlock." That such is not its sole meaning is manifest from the case of *Birtwhistle* v. *Vardill* above cited, in which it is repeatedly admitted that a son might be "legitimate" who was not born in wedlock. The definition in 1 R. S. [m. p.], 642, § 1 is limited expressly to the title of the statutes which there commences.

The meaning of the word has reference to the law of the State which can create the *status*. "Legitimate," under the laws of Scotland, and generally under the civil law, applies to a child of

persons lawfully married before or after its birth. Can it be said that such a child loses its legitimacy when it goes into England or comes into this State ? Is the child of parents lawfully married in Pennsylvania, legitimate there and illegitimate here ?

This is not a question as to the effect of foreign laws of adoption. Our statute gives the inheritance, not to adopted children, but to "lineal descendants ; " words which do not include adopted children.

Of course, this is a question of law not of equity. But, inasmuch as the question is new in this State, and no precedents have already been made to guide the action of parties, it is proper to consider the justice of the case. There had existed among the Romans a practice of concubinage, a permanent connection without the sanction of marriage. (Heinec Synt. Adp. 1. 1., § 38.) Whether a connection was marriage or concubinage appears to have depended on intent. (Dig., XXV, 7, 4.) Constantine established the rule that children who had then been born in concubinage, called natural children, should be legitimated by a subsequent marriage. (Code V., 27, 5.) Other emperors extended the rule, so that at last a subsequent marriage gave to children born in concubinage full legitimacy. (Inst. I., 10, 13; C. V., 27, 10; Mackenzie Rom. Law, 126; Voet Comm. Adp., XXV, 7, 6; Heinec Synt., 1, 10; § 23, etc.) Justinian established another mode of legitimation, where the emperor, at the request of the father, declared a child legitimate. Thus it appears that legitimacy can be conferred by the supreme power of the State.

The canon law adopted the rule : *Tanta est vis matrimonii ut qui antea sunt geniti post contractum matrimonium legitimi habeantur.* (Decret. IV, 17, 6.) The same rule has been established in countries which receive the civil and canon laws, and by some States in this country.

The parents of the plaintiff, trusting to the laws of Pennsylvania, did what they could to repair the injury inflicted upon him. Whether he should be legitimate, or illegitimate, was a matter which concerned him and them only. That State had provided a mode by which his parents could give him the *status* of legitimacy. It does not appear that there was any legal barrier to the marriage of his parents, either when it was contracted, or at the

time of his birth. And the act of the parents in thus relieving the plaintiff from the stain on his birth was just and righteous. It ought to have its full force here; the full force given to it by the law of Pennsylvania. That State had a right thus to encourage two persons, who were subject to its laws, to change from a condition of unlawful connection to the lawful condition of marriage; and it had a right to promise them that, by so doing, they should give their child the full benefit of legitimacy.

We cannot doubt that the father trusted to this law of Pennsylvania and believed that his son was legitimate. In this belief he died intestate, feeling no necessity of making any will, and supposing that his son would inherit his property. It is just that the son should inherit, and I see no rule of law which forbids. There is nothing requiring us to construe the statute of descents so as to exclude children made legitimate by the consent of their parents and by the authority of law, subsequent to their birth.

I have not here considered the question how far the Constitution of the United States, requiring full faith and credit to be given to the public acts of other States applies to the present case. (Const., art. IV, § 1.) Yet it may be asked whether, if a special statute of Pennsylvania had declared this plaintiff legitimate, this State could disregard that statute? And is not a general act of equal force with a private statute? But I have preferred to put the matter on the general ground of the authority of every State or country over the *status* of its citizens; and on the ground that such *status* goes with the person, even to other States and countries.

Present — LEARNED, P. J.; BOARDMAN and FOLLETT, JJ.

Judgment affirmed, with costs.