LAVIN *v.* THE EMIGRANT INDUSTRIAL SAVINGS BANK.

*(Circuit Court, S. D. New York.* April 1, 1880.)

PAYMENT TO ADMINISTRATOR—LETTERS ISSUED DURING ABSENCE OF CREDITOR FROM STATE — "DUE PROCESS OF LAW " — ESTOPPEL. Payment to a foreign administrator upon the presentation of ancillary letters duly issued by a surrogate upon the proof of the original letters issued under a statute of the foreign state, providing that "if any person shall be absent from this state for the term of three years, without due proof of his being alive, administration may be granted upon such person's estate as if he were dead," will not avail as a defen.*:* to the subsequent demand of the creditor.

*E. D. McCarthy,* for plaintiff.

*J. E. Devlin,* for defendant.

CHOATE, J. In this case a jury trial has been waived. The plaintiff, an alien, sues to recover the sum of $400 deposited by him with the defendant, an incorporated savings bank doing business in New York city, with the accumulated interest. The answer admits the deposit by one John Lavin of $300 on the eighteenth day of July, 1865, and of $100 on the thirteenth day of January, 1866. It sets up as a defence that on the fourteenth day of February, 1877, one John M. Brennan made application to the surrogate of the city and county of New York for letters of administration upon the estate of the said John Lavin, and that thereupon the said surrogate decided upon such application that the said John Lavin was deceased and had died intestate, leaving assets within said city and county, and thereupon appointed John M. Brennan administrator, and issued to the said John M. Brennan letters of administration of the goods, etc., whereof the said Lavin died possessed in the state of New York; that thereafter, and while said decision of the surrogate was in full force and unreversed, said Brennan presented his said letters to the defendant and demanded, as administrator of John Lavin, the said amount deposited, with accrued interest, and the defendant thereupon paid the same to him.

The answer denies that it was the plaintiff who made these deposits, but his identity was fully established by the evi

dence, and the only question to be determined is that raised by the fact of payment of the deposit to Brennan.

Upon the trial the following facts appeared: The plaintiff was born in Ireland, and came to this country about the year 1859, and soon thereafter he became domiciled at the town of Cranston, Rhode Island, where he remained till after he made these deposits, except that he was temporarily absent for about two years, while in the service of the government, at Hilton Head. After making these deposits he returned to Cranston and remained there about a year, when he went to California. He left in charge of a friend in Cranston a trunk containing some personal effects, including his savings bank pass-book. When he went away he expressed the intention of returning in five years. In California he married, and lived with his wife and children for a number of years, and in April, 1879, he returned to Rhode Island, where he was living when this action was commenced.

After he left for California, and until his return to Rhode Island, in 1879, he had no communication whatever with any person in Rhode Island or elsewhere in the eastern states, or in New York, and no one in any of these states, so far as appears, was aware during all this time of his whereabouts, or whether he was alive or dead. By the laws of Rhode Island it is enacted that "if any person shall be absent from this state for the term of three years, without due proof of his being alive, administration may be granted upon such person's estate as if he were dead." The same statute also provides that in case such person returns into the state the administrator shall account with and pay over to him any assets remaining in his hands, and also account for what he has disposed of under his trust. Under this statute application was made in 1877, after the plaintiff had been absent about 10 years, to the court of probate of the town of Cranston, county of Providence, and state of Rhode Island, for letters of administration upon the real and personal estate of the plaintiff.

Letters of administration were accordingly issued, bearing date the twenty-fifth day of January, 1877, to John M. Bren-

nan, in the following form: "You having been appointed by this court administrator on the real and personal estate of John Lavin, absent from the state without due proof of his being alive, late of the town of Cranston, and having given bond as the law directs, are hereby authorized and empowered to receive, recover and take possession of all and whatsoever real and personal estate which to the said John Lavin doth appertain and belong, and the same fully to administer according to law. Witnesses, etc." On the fourteenth of February, 1877, John M. Brennan applied to the surrogate of New York for ancillary letters of administration. Upon this application he presented his Rhode Island letters, duly authenticated, and also his own affidavit, "that to the best of deponent's information and belief the said John Lavin is dead."

The petition of John M. Brennan to the surrogate states that "your petitioner is a resident of Providence, etc., and is the administrator duly appointed by the probate court of the town of Cranston, county of Providence, Rhode Island, of the personal estate of the said John Lavin, deceased, etc." Upon this petition, and the affidavit and the Rhode Island letters, the surrogate of New York issued ancillary letters of administration, which are addressed to "John M. Brennan, etc., administrator duly appointed by the probate court of the town of Cranston, etc., of the personal estate of John Lavin, deceased;" and the letters recite that the said John Lavin is dead. Under the authority of these letters Brennan collected the money of the bank as stated in the answer.

The statute of Rhode Island permits and provides for administration on the estate of persons who leave the state and remain absent for three years. This is all that is required to be shown under the statute, before the issuing of the letters. This is all that is recited in the Rhode Island letters. They do not purport, on their face, to be letters of administration on the estate of a deceased person.

The first question to be considered is whether payment to Brennan bars the plaintiff's claim, on the ground that Brennan held the letters of administration issued by the surrogate of New York. In the case of *Roderigas* v. *East River Savings*

*Institution,* 63 N. Y. 460, the court of appeals held that under the statutes of this state the surrogate has jurisdiction and is authorized to issue letters of administration in two cases: *First,* when the person whose estate is to be administered is dead; and, *second,* when the surrogate judicially determines that the party is dead, although, in fact, he is alive. Consequently a payment by a debtor of the supposed decedent, made in good faith, to a person to whom letters of administration had been granted by the surrogate, was held to bar the claim of the administratrix, duly appointed after the death of the party.

This decision, which was by a divided court, three of the seven judges dissenting, is based on the peculiar language of the statutes of New York, which indicated, as held by the majority of the court, an intention that, in favor of innocent third persons dealing in good faith with the person holding such letters, the decision of the surrogate upon the fact of death should be deemed conclusive as against the supposed decedent; and although the operation of the rule is admitted to work a hardship on the supposed decedent, by distributing his property while he is alive among his creditors and next of kin, yet the legislation is defended as proper, and within the principle that the legislature may protect innocent persons from loss or injury when acting in reliance upon acts of public officers, and decrees of courts proceeding with apparent authority and jurisdiction; and, as bearing on the propriety of such protective laws, the suggestion is also made that, by the voluntary and unexplained absence of the party supposed to be dead, he has by his own acts induced the decision made by the surrogate that he was dead.

In a subsequent decision in the same case (unreported) the same court held, however, that to sustain the letters of administration, where the party was alive, there must be produced to the surrogate some competent evidence of the party's death, and the surrogate must himself pass on the question judicially; and, therefore, as it appeared in that case that there was no competent proof of death produced, and that the surrogate had not himself passed judicially on the ques-

tion of death, the defence of payment to the person holding such letters was overruled. The evidence of death produced in that case was the averment of the death, in the petition for the letters, upon the best of the petitioner's knowledge, information and belief; and it was found as a fact by the trial court that the surrogate never saw the petitioner, nor acted upon her petition, nor issued the letters, but that they were issued by his clerk, who used for that purpose a form signed by the surrogate in blank, which the clerk filled out and to which he affixed the seal.

In the present case the evidence offered in proof of death was the petition for letters and the affidavit of the petitioner and the Rhode Island letters. The affidavit of the petitioner is clearly subject to the objection held good by the court of appeals in their decision last above referred to. It neither states as a fact, within the knowledge of the affiant, that John Lavin was dead, nor does it state any facts from which an inference could be drawn that he was dead. It merely states, as did the petition in the case cited, that he was dead to the best of the deponent's information and belief. The Rhode Island papers contained no averment of death, but only of his absence from the state of Rhode Island, and in no way can the granting of such letters in Rhode Island be held by any implication to involve the finding of the fact of death, because the statute authorizes and expressly provides for the issuing of letters on the estate of living persons absent from the state, and these letters, on inspection, appear to have been issued only on evidence of such absence.

The petition in the present case, however, appears to be unlike the petition in the second case of Roderigas. The petition avers positively, and without qualification, the death of Lavin; and the verification by the petitioner is "that the matters of fact therein stated are true, and that the matters therein stated, of my information and belief, I believe to be true." There are certain matters averred as upon information and belief in the petition, but this particular fact of the death of Lavin is not so averred. It is stated as a fact, and therefore that averment is positively sworn to as true in the verification.

I am not able to say, therefore, that there was not some evidence of the death before the surrogate. It is true that, in an affidavit sworn to the same day with the petition, the petitioner stated that Lavin was dead "to the best of deponent's information and belief." While the making of this affidavit was calculated to raise a doubt whether the positive averment in the petition was not a mistake, yet the two averments are not absolutely inconsistent. It is possible that he had actual knowledge of the death as averred in the petition. It would not, on that account, be an untrue or false statement that "to the best of his information and belief," also, Lavin was dead.

The effect of the affidavit as evidence is a matter merely of the sufficiency of the proof. It may have weakened, but did not destroy, the other evidence. Notwithstanding the affidavit, there still remained some competent evidence of death, and if the surrogate held it sufficient proof of the fact his decision cannot be attacked collaterally on the ground that there was error in weighing the evidence.

The present case also differs from that of Roderigas, in respect to the proof of the surrogate having acted judicially on the petition. In that case the fact was found that the surrogate did not act at all. Here the proof is that the papers were submitted to the administration clerk; that the case being an unusual one he submitted them to Mr. Minor, the chief clerk of the surrogate, who returned them with the indorsement, "Issue letters—C. M."

Here the proof stops. It is contended by the defendant that as there is no evidence that the surrogate did not pass on the question, and as the letters are signed by him, and bear the seal of the court, the presumption is that he did his duty, and that the letters were legally and properly issued, and the seal affixed by his authority. The plaintiff, on the other hand, contends that the action of the surrogate in passing on the question of death being essential to the validity of the letters—a prerequisite to his jurisdiction and power to issue them—the burden is on the defendant, who sets up the fact, to prove that such decision was made by the surrogate.

There is no question of the general rule of law that where

an act is justified or a title made under the official act or decree of an officer or court of special and limited jurisdiction, the burden is on the party setting up such title, or justifying such act, to prove that the officer or court had jurisdiction. There must be evidence of those facts, the existence of which are essential to the exercise of the power or jurisdiction. This rule is recognized by statute in the state of New York. Code of Civ. Proc. § 532. It is, however, independently of all statute, a well settled rule of evidence, of general application.

But no well considered case has gone so far as to hold that where a record is produced, made up and authenticated in the accustomed and proper manner, which on its face recites and declares the action which the officer or court has taken upon the matter in question, such record is not *prima facie* evidence that such action has in fact been taken, even although such action is essential to the validity of the proceeding of the court, or the officer under which title or justification is attempted to be made. On the contrary the presumption is always that the proceedings and acts of a court or public officer, apparently done in the discharge of his or its official duty, are regular and lawful, until the contrary is shown. To this extent this presumption does not go so far as to supply, without proof, facts not appearing by the record essential to the jurisdiction, but it certainly extends to those facts recited in the record as the action taken by the court or officer, and which it was a part of its or his official duty, either by statute or well settled practice, to make a part of his record. So far as the record shows, on its face, that he acted, his action, in the absence of evidence to the contrary, is presumed to be lawful rather than unlawful. It is obvious that any other rule than this would, in practice, lead to great insecurity in respect to all titles or proceedings based upon the action of courts and officers of limited and special jurisdiction.

In this case the letters issued by the surrogate of New York are such a record, purporting to show the action of the surrogate. They are signed by him and sealed with the seal of his office, and are in the accustomed and proper form.

They declare, by way of recital and as a fact to which he attests, that John Lavin lately departed this life. This, it seems to me, is, on well settled principles, *prima facie* evidence that the surrogate determined and found judicially that John Lavin was dead. The precise question here is not of the burden of proof as to this essential fact of a decision by the surrogate, but of the sufficiency of the evidence offered to sustain that burden, which is undoubtedly on the defendant, and I think the evidence is *prima facie* sufficient.

*Roderigas* v. *Savings Institution* (second decision) is an authority that this recital in the record as to the action of the surrogate, and this *prima facie* proof of his personal action, to be presumed from his signature and official seal, can be shown to be false; that it may be proved in contradiction of this record that the surrogate did not sign it, as he appears on its face to have done, and that what he signed was in fact a blank piece of paper; that he did not authorize the seal to be affixed, as he appears to have done; that he did not in fact receive and pass upon the petition, and the testimony adduced in support of it, as by the record he appears, and is presumed, in the due and proper exercise of his official duty, to have done.

All this was shown in impeachment of the record in the case cited, and this proof defeated and showed to be null and void the apparently regular record. But such is not this case. Nothing is shown in this case inconsistent with the surrogate having passed judicially on the petition, with his having signed the letters, after he had so judicially determined, and with his having personally authorized them to be sealed and issued. It is proved that the administration clerk did not take the responsibility of issuing them. He handed the papers to the chief clerk, and they came back with the indorsement, "Issue letters," signed with the chief clerk's initials.

There was nothing in this to show that they were not submitted to the surrogate, and passed on and signed by him, as they appear to have been. It was his official duty to receive and act on them, and by the record it appears that he did so. The fact that the chief clerk put his initials to

the indorsement does not tend to show that he did not.  The chief clerk was a proper officer to receive and note his instructions.  It certainly cannot be held that this evidence is sufficient, if, indeed, it has any competency, to overthrow the record.  Both the chief clerk and the surrogate would have been competent witnesses for the plaintiff, and they were the only persons, apparently, who knew the fact, if the fact was otherwise than appears by the record.  Neither of them was called.  There is no statute of New York referred to which requires, nor is the point made against these letters, that the petitioner or witnesses should be produced in person before the surrogate, or examined *viva voce*, or that the proof of the essential facts may not be made to his satisfaction by affidavit.

It must therefore be held that this case is not brought within the second decision of the case of *Roderigas* v. *Savings Institution*, and that the surrogate passed upon the question of the death of John Lavin upon competent evidence; that the letters were issued by him; and that in these respects, and if there is no other fatal objection, the case is within the first decision by the court of appeals, which held the finding of the fact of death conclusive as against the alleged intestate, at least as a protection to an innocent party acting in good faith in reliance upon the letters.

It is urged, however, that the decision referred to should not be followed by this court; that it is not supported by authority or reason; that the court was almost equally divided, and that in the second decision the authority of the first decision is questioned and greatly impaired.  The fact that the decision was made by a divided court does not make the decision any the less authoritative, if the point considered was deliberately determined by the court.

In all cases that fall within the thirty-fourth section of the judiciary act, (Rev. St. § 721,) which makes the statutes of the several states rules of decision in the courts of the United States in all actions at common law, the decision of the highest judicial court of the state on the construction of the state statute is followed by the courts of the United States.  Thus,

in *Leffinwell* v. *Warren*, 2 Bl. 603, the supreme court says: "The construction given to a statute of a state by the highest judicial tribunal of such state is regarded as a part of the statute, and is as binding upon the courts of the United States as the text. If the highest tribunal of a state adopt new views as to the proper construction of such a statute, and reverse its former decisions, this court will follow the latest settled adjudications."

In *Shelby* v. *Gay*, 11 Wheat, 367, that court says: "Nor is it questionable that a fixed and received construction of their respective statute laws in their own courts makes, in fact, a part of the statute law of the country, however we may doubt the propriety of that construction. It is obvious that this admission may, at times, involve us in seeming inconsistencies, as where states have adopted the same statutes and their courts differ in their construction; yet that course is necessarily indicated by the duty imposed on us to administer as between certain individuals the laws of the respective states according to the best lights we possess of what those laws are."

In *Green* v. *Neal's Lessees*, 6 Pet. 299, the same court says: "The inquiry is, what is the settled law of the state at the time the decision is made? This constitutes the rule of property within the state, by which the rights of litigant parties must be determined. As the federal tribunals profess to be governed by this rule they can never act inconsistently by enforcing it. If they change their decision it is because the rule on which that decision was founded has been changed." This rule seems to admit of no exception unless where, in case of a change of a judicial construction by the state court, a contract legal according to the decision of the highest court of the state, when it was made, will be invalidated by following the later decision. In such a case, as respects such a contract, such a change in the law is held to be a violation of the obligation of a contract by the state, and is within the inhibition of the constitution of the United States. *Gelpke* v. *City of Dubuque*, 1 Wall. 206.

Subject to this exception, which has no application to the

present case, this court must follow the decision of the court of appeals in the same way in which any other court in the state of New York must do so, and the question of the propriety of the decision is not open. If that court should see fit to re-open the question and reverse its decision, the federal courts will be bound to accept and to follow its newly declared views of the construction of the statute. The fact that the court were divided shows that the point was doubtful before it was decided, but after it was decided by a majority of voices the decision became the law of the state for all other courts. In the subsequent decision the court of appeals explained their former decision, and distinguished the case before them from it; but, although evidently pressed to reconsider the question before decided, they say "that decision was concurred in by a majority of the court, and we do not feel justified in reviewing it upon the merits."

That the point decided—the extent of the jurisdiction of the surrogate—is a matter of construction of a state statute, on which the courts of the United States are bound by law to follow the state court, does not admit of doubt. Such a decision is as clearly within the thirty-fourth section of the judiciary act as any decision can be, and it is equally clear that the point decided was that the statute of New York gave the surrogate power to issue letters of administration in two cases: *First,* when the alleged decedent is in fact dead; and, *second,* when the surrogate judicially determines that he is dead; and also that the meaning of the statute is that such determination of the surrogate is conclusive in favor of an innocent party who has, on the faith of the letters so issued, dealt with the administrator, and against the supposed decedent, though he was, in fact, alive.

But while this court must follow and adopt this same construction of the statutes of New York, the question whether, by these statutes and the proceedings taken under them, the plaintiff has been "deprived of his property without process of law" is one on which the decision of the state court is not controlling, and is entitled only to so much weight and authority as the reasoning of the court shall give to their opin-

ion. By the fourteenth amendment to the constitution of the United States, adopted prior to the present transaction, it is provided, among other things, that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Prior to the adoption of this amendment there was no constitutional inhibition upon the states preventing them from depriving persons of their property without due process of law, except such as may have been contained in their own constitutions. The fifth amendment of the constitution of the United States provided that no person "shall be deprived of life, liberty, or property, without due process of law;" but it was early held that this was restrictive only on the powers of the government of the United States, and not upon those of the states. *Barron* v. *Mayor, etc., of Baltimore,* 7 Pet. 243. Although the constitution of the state of New York contains the same restriction upon its government, yet the interpretation of that constitution, like the construction of any other statute of the state, is a matter in which the federal courts are bound to follow the decision of the highest judicial tribunal of that state. *Webster* v. *Cooper,* 14 How. 488, 504.

In the case of *Roderigas* v. *Savings Institution,* 63 N. Y. 460, one of the learned judges, who delivered the opinion of the majority of the court, expressed the opinion that the statutes under consideration, as applied in that case, could not be regarded "as divesting a person of his property, or interfering with rights, without due process of law, in violation of a constitutional right." Per *Miller,* J. P., 473. Although it does not appear in the opinions given that the judges specially referred to the prohibitory provision in the fourteenth amendment to the constitution of the United States, yet, as the provision in the constitution of the state of New York is substantially the same, it must be assumed, since otherwise the judgment rendered could not have been given, that, in the opinion of the four judges who concurred in the

decision, the plaintiff was not deprived of his property without due process of law. But whether the three dissenting judges dissented on this or on some other ground does not appear. The weight of this case, as an authority on a point on which it is not controlling, is, however, greatly impaired by the dissent of three out of the seven judges constituting the court, there being nothing to show that they did not dissent on this very ground.

In considering this question the first inquiry is whether, by force of the laws of New York and of the proceedings under them, if they are held valid, the plaintiff has been *"deprived of his property"* by the state of New York, within the meaning of the constitutional provision; for if he has not been deprived of his property, or if he has not been so deprived by the state of New York, it necessarily follows that the constitutional provision has not been violated, and it need not be further considered whether the means employed in doing what has been done are properly described as "due process of law." An examination of the opinions in the case of *Roderigas* v. *Savings Institution* shows that the court did not hold that for all purposes and in favor of all persons, as against the supposed decedent, the title to his property vested in the administrator, but only that it so vested in favor of innocent third persons who had dealt with the administrator on the faith of the letters.

The case before the court did not call for anything further than this, and I think it is entirely consistent with the opinions delivered that, if the defendant had not paid the deposit to the administrator, and the supposed decedent had himself demanded it, the proceedings in the surrogate's court and the issue of the letters would not have been held to be a defence. In other words, the decision was not strictly that by virtue of the appointment of the administrator and the issue of the letters the *title* passed, as it undoubtedly does in the case of a deceased person, but that for the protection of the defendant and for equitable reasons the supposed decedent was estopped to deny, as against the defendant, that the letters were valid; that the fact of death was as found by the sur-

rogate, and the title had passed. There can, however, be no doubt that the raising of an estoppel against a person claiming his property is, to all intents and purposes, depriving him of it, within the meaning of such a constitutional provision, as truly as the actual vesting of the title to it in another would do. It absolutely and entirely deprives him of the use and enjoyment of it.

In the recent case of *Mann* v. *Illinois*, 94 U. S. 113, it was held that a statute of Illinois, regulating the price which warehousemen should charge for the use of their warehouses, did not deprive them of their property within the meaning of the fourteenth amendment, because the owners having devoted it to a public use the public acquired the right for the common good to control that use, at least to the extent of making reasonable regulations in respect to the price the owner should charge. But no doubt whatever was expressed that the taking away from the owner of the use of property strictly private would be depriving the owner of it within the meaning of this constitutional prohibition, and the two justices who dissented from the opinion put their dissent partly on the ground that such restriction upon or regulation of the use of property by its owner was depriving him of it within the meaning of this amendment.

Full effect, clearly, cannot be given to this restrictive clause according to its plain sense, considering the purpose it was intended to subserve as a protection against encroachment on private rights, unless it be held to prohibit not only the deprivation of the legal title, but also the impairment of the possession, use or enjoyment by the owner of his private property, subject of course to that power which exists in every civilized state by law to regulate the conduct of its inhabitants, and their use of their property, so that they shall not unnecessarily injure others, according to the ancient maxim, "*sic utere tuo ut alienum non lædas*," of which maxim and its application the case last cited is a striking example.

In construing that other restrictive clause of the constitution which prohibits the states from passing any law which impairs the obligation of contracts, Mr. Chief Justice Taney, de-

livering the opinion of the supreme court, says: "It would be unjust to the memory of the distinguished men who framed it to suppose that it was designed to protect a mere barren and abstract right, without any practical operation upon the business of life. It was undoubtedly adopted as a part of the constitution for a great and useful purpose. It was to maintain the integrity of contracts, and to secure their faithful execution throughout this Union, by placing them under the protection of the constitution of the United States; and it would but ill become this court, under any circumstances, to depart from the plain meaning of the words used, and to sanction a distinction between the right and the remedy, which would render this provision illusive and nugatory—mere words of form, affording no protection and producing no practical results."

Accordingly the supreme court has uniformly held that any law subsequent to the making of a contract, materially impairing the remedies for its enforcement to which the obligee was entitled at the time it was made, is void as impairing the obligation of the contract. *Bronson* v. *Kingee*, 1 How. 318. And in *Green* v. *Biddle*, 8 Wheat. 75, Mr. Justice Washington says: "Nothing, in short, can be more clear upon principles of law and equity than that a law which denies to the owner of land a remedy to recover the possession of it when withheld by any person, however innocently he may have obtained it, or to recover the profits received from it by the occupant, or which clogs the recovery of such possession and profits by conditions and restrictions tending to diminish the value and amount of the thing recovered, impairs his right to and interest in the property. If there be no remedy to recover the possession, the law necessarily presumes a want of right to it. If the remedy afforded be qualified and restrained by conditions of any kind, the right of the owner may indeed subsist and be acknowledged, but it is impaired and rendered insecure according to the nature of such restriction."

Further citations are clearly unnecessary for the proposition that in the construction of this constitutional prohibition

no just distinction can be made between the owner's title and his possession, between his abstract right of property and those incidents of use and enjoyment which constitute the value of ownership, or between a law or proceeding which purports to effect a change of title and one which purports to estop him from recovering the possession of the property, while not denying his title. Nor can there be any doubt that if the plaintiff is deprived of his property by the decision of the surrogate that he is dead, made binding and conclusive upon him by act of the legislature, he is deprived of his property by the state, within the meaning of the constitution. The prohibition clearly extends to the action of the state, through any or all of the departments, legislative, executive or judicial.

The principal question, however, still remains whether the plaintiff in this case, who, by the statutes of New York, as construed by its courts, and by the proceeding had under those statutes, would clearly be deprived of his property—that is, of his claim against his debtor, the defendant—would be so deprived of it "*by due process of law.*" If he would not be he has no ground of complaint in this court.

The term, "due process of law," as used in the fourteenth amendment of the constitution of the United States, is the same expression used in many of the state constitutions and in the fifth amendment, above referred to. Its meaning has been many times expounded by the supreme court.

In *Walker* v. *Sanvinet*, 92 U. S. 92, Mr. Chief Justice Waite says: "A state cannot deprive a person of his property without due process of law, but this does not necessarily imply that all trials in the state court affecting the property of persons must be by jury. This requirement of the constitution is met if the trial is had according to the settled course of judicial proceedings. Due process of law is process due according to the law of the land. This process in the states is regulated by the law of the state. Our power over that law is only to determine whether it is in conflict with the supreme law of the land; that is to say, with the constitution and laws of the United States made in pursuance

thereof, or with any treaty made under the authority of the United States.    Here the state court has decided that the proceeding below was in accordance with the law of the state, and we do not find that to be contrary to the constitution or any law or treaty of the United States."

In *Kennard* v. *Louisiana*, 92 U. S. 480, where the law of a state provided for a proceeding by rule before a court for testing the right to an office, and the party whose right was disputed was required to put in his answer within 24 hours, and then the case was to be tried immediately before the judge, without a jury, and in preference to all other causes, and the law imposed the burden of proof upon the incumbent, and in favor of the party who held the governor's commission, it was held that this was due process of law within the meaning of the fourteenth amendment.    Mr. Chief Justice Waite there says : "The sole question presented for our consideration in this case, as stated by the counsel for the plaintiff in error, is whether the state of Louisiana, acting under the statute of January 15, 1873, through her judiciary, has deprived Kennard of his office without due process of law.    It is substantially admitted by counsel in the argument that such is not the case if it has been done 'in the due course of legal proceedings, according to the rules and forms which have been established for the protection of private rights.'    We accept this as a sufficient definition of the term 'due process of law' for the purposes of the present case.    The question before us is not whether the courts below having jurisdiction of the case and the parties have followed the law, but whether the law, if followed, would have furnished Kennard the protection guaranteed by the constitution."    He then reviews the statute in detail, and says : "There is here no provision for a technical *citation*, so called, but there was in effect provision for a rule upon the incumbent to show cause, etc.    *    *    *    He was to be told when and where he must make his answer.    *    *    *    He had an opportunity to be heard before he could be condemned.    This was 'process,' and when served it was sufficient to bring the incumbent into court,

and to place him within its jurisdiction." And the court, in conclusion, say:

"From this it appears that ample provision has been made for the trial of the contestation before a court of competent jurisdiction, for bringing the party against whom the proceeding is had before the court and notifying him of the case he is required to meet, for giving him an opportunity to be heard in his defence, for the deliberation and judgment of the court, for an appeal from this judgment to the highest court of the state, and for hearing judgment thereon. A mere statement of the facts carries with it a complete answer to all the constitutional objections urged against the validity of the act. The remedy provided was certainly speedy, but it could only be enforced by means of orderly proceedings, in a court of competent jurisdiction, in accordance with rules and forms established for the protection of the rights of parties."

In the *United States* v. *Cruikshank,* 92 U. S. 554, the supreme court again say: "The fourteenth amendment prohibits a state from depriving any person of life, liberty or property without due process of law, but this adds nothing to the rights of one citizen as against another. It simply furnishes an additional guaranty against any encroachment by the states upon the fundamental rights which belong to every citizen as a member of society. As was said by Mr. Justice Johnson, in *Bank of Columbia* v. *Okely,* 4 Wheat. 244, it secures the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice."

In the case of *Bank of Columbia* v. *Okely,* 4 Wheat, 235, last referred to, it was held that a statute of Maryland, incorporating a bank and giving to the corporation a summary process by execution, in the nature of an attachment against its debtors, who had, by an express consent in writing, made the bonds, bills or notes by them drawn or indorsed negotiable at the bank, was not repugnant to the constitution of the state of Maryland, which provided that "no freeman ought to be imprisoned, etc., or deprived of

his life, liberty or property but by the judgment of his peers, *or the law of the land.*"

Referring to this provision, and that contained in the constitution of the United States, the court say: "What was the object of these restrictions? It could not be to protect the citizen from his own acts, for it would have operated as a restraint upon his rights. It must have been against the acts of others. But to constitute particular tribunals for the adjustment of controversies among them, to submit themselves to the exercise of summary remedies, or to temporary privation of rights of the deepest interest, are among the common incidents of life. Such are submissions to arbitration, such are stipulation bonds, forthcoming bonds, and contracts of service; and it was with a view to the voluntary acquiescence of the individual, nay, the solicited submission to the law of the contract, that this remedy was given. By making the note negotiable at the bank the debtor chose his own jurisdiction. In consideration of the credit given him he voluntarily relinquished his claim to the ordinary administration of justice, and placed himself only in the situation of an hypothecator of goods, with power to sell on default, or a stipulator in the admiralty, whose voluntary submission to the jurisdiction of the court subjects him to personal coercion. It is true, cases may be supposed in which the policy of a country may set bounds to the relinquishment of private rights; and this court would ponder long before it would sustain this action, if we could be persuaded that the act in question produced a total prostration of the trial by jury, or even involved the defendant in circumstances which rendered that right unavailing for his protection."

This case is important as showing to what extent the express assent of the party to the relinquishment of constitutional guaranties for the protection of his rights of property will obviate the constitutional objection to the want of ordinary judicial proceedings for taking it from him. In *Murray's Executors* v. *Hoboken Land & Insurance Company*, 18 How. 272, it was held that the taking of property to satisfy a claim against a tax collector for a balance due the gov-

ernment under a distress warrant issued by the solicitor of the treasury, pursuant to an act of congress, was not depriving the owner of his property without "due process of law," within the meaning of the fifth amendment to the constitution. It was held that "due proceess" was not necessarily and exclusively judicial process; that the term included process for the collection of taxes, and that the process for collection of a balance due from a tax collector by such a warrant was sustained as due process by the practice of the government in these states, and in England before the adoption of the constitution.

Mr. Justice Curtis, in giving the opinion of the court, says: "Tested by the common and statute law of England prior to the emigration of our ancestors, and by the laws of many of the states at the time of the adoption of the amendment, the proceedings authorized by the act of 1820 cannot be denied to be due process of law when applied to the ascertainment and recovery of balances due to the government from a collector of customs, unless there exists some other provision which restrains congress from authorizing such proceedings. For, though 'due process of law' generally implies and includes *actor, reus, judex,* regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings, yet this is not universally true. There may be, and we have seen that there are, cases under the law of England after *Magna Charta,* and as it was brought to this country and acted on here, in which process, in its nature final, issues against the body, lands and goods of certain public creditors without any such trial."

But, perhaps, as full, precise and well considered an exposition of this constitutional guaranty as has been made is furnished by the supreme court of the state of New York in the case of *Taylor* v. *Porter,* 4 Hill, 145. Mr. Justice Bronson there says: "The words 'by the law of the land,' as here used, (*i. e.,* in the state constitution,) do not mean a statute passed for the purpose of working the wrong. That construction would render the restriction absolutely nugatory, and turn this part of the constitution into nonsense. The

people would be made to say to the two houses 'you shall be vested with the legislative power of the state, but no one shall be disfranchised, or deprived of any of the rights or privileges of a citizen, unless you pass a statute for that purpose;' in other words, 'you shall not do the wrong unless you choose to do it.' The section was taken, with some modifications, from a part of the twenty-ninth chapter of *Magna Charta*, which provided that no freeman should be taken or imprisoned, or be disseized of his freehold, etc., but by lawful judgment of his peers or *by the law of the land.*

"Lord Coke, in his commentary upon this statute, says that these words, ' by the law of the land,' mean by the due course and process of law, which he afterwards explains to be ' by indictment or presentment of good and lawful men, where such deeds be done in due manner, or by writ original of the common law.' 2 Inst. 45, 50. In North Carolina and Tennessee, where they have copied almost literally this part of the twenty-ninth chapter of *Magna Charta*, the terms ' law of the land' have received the same construction. 1 Dev. 1; 10 Yerger, 59. The meaning of the section, then, seems to be that no member of the state shall be disfranchised, or deprived of any of his rights or privileges, unless the matter shall be adjudged against him upon trial had according to the course of the common law. It must be ascertained judicially that he has forfeited his privileges, or that some one else has a superior title to the property he possesses, before either of them can be taken from him. It cannot be done by mere legislation. But if there can be a doubt upon the first section of the seventh article, there can, I think, be none that the seventh section of the same article covers the case. ' No person shall be deprived of life, liberty or property *without due process of law*, nor shall private property be taken for public use without just compensation.'

"In the *Matter of Albany Street*, 11 Wend. 149, where it was held that private property could not be taken for any other than public use, Chief Justice Savage went mainly upon the implication contained in the last member of the clause just cited. He said: 'The constitution, by authoriz-

ing the appropriation of private property to public use, impliedly declares that for any other use private property shall not be taken from one and applied to the private use of another.' And in *Bloodgood* v. *The Mohawk & Hudson R. R. Co.* 18 Wend. 59, Mr. Senator Tracy said: 'The words should be construed as equivalent to a constitutional declaration that private property, without the consent of the owner, shall be taken *only* for the public use, and then only upon a just compensation.'

"I feel no disposition to question the soundness of these views, but still it seems to me that the case stands stronger upon the first member of the clause, 'No person shall be deprived of life, liberty or property *without due process of law.' The words 'due process of law,' in this place, cannot mean less than a prosecution or suit instituted and conducted according to the prescribed forms and solemnities for ascertaining guilt, or determining the title to property.* It will be seen that the same measure of protection against legislative encroachment is extended to life, liberty and property, and if the latter can be taken without a forensic trial and judgment, there is no security for the others. If the legislature can take the property of A. and transfer it to B., they can take A. himself and either shut him up in prison or put him to death. But none of these things can be done by legislation. There must be 'due process of law.'"

These authorities would seem to be more than sufficient to establish the proposition that it is not competent for a state, by a law declaring a judicial determination that a man is dead, made in his absence, and without any notice to or process issued against him, conclusive for the purpose of divesting him of his property, and of vesting it in an administrator for the benefit of his creditors and next of kin, either absolutely or in favor of those only who innocently deal with such administrator. The immediate and necessary effect of such a law is to deprive him of his property without any process of law whatever as *against him,* although it is done by process of law against other people, his next of kin, to whom notice is given.

Such a statutory declaration of estoppel by a judgment to which he is neither party nor privy, which has the immediate effect of divesting him of his property, is a direct violation of this constitutional guaranty. No such thing is known to the law as a judgment to which a person is neither a party nor a privy being conclusive against him. This has been repeatedly declared in the most emphatic terms by the supreme court of the United States. While, on the other hand, one who is a party or a privy to a judgment is conclusively bound thereby, and by the determination of every question necessarily determined therein; even by the determination of a fact essential to the jurisdiction of the court, so that he cannot impeach the decree collaterally by denying that fact, but is limited to those remedies provided for reviewing the decree by an appellate court.

Thus, in the case of *The Mary*, 9 Cr. 144, Mr. Chief Justice Marshall says : "The whole world, it is said, are parties to an admiralty cause. The reason on which this *dictum* stands will determine its extent. Every person may make himself a party, and appeal from the sentence, but notice of the controversy is necessary in order to become a party, and it is a principle of natural justice, of universal obligation, that, before the rights of an individual be bound by a judicial sentence, he shall have notice, either actual or implied, of the proceedings against him. Where these proceedings are against the person, notice is served personally, or by publication; where they are *in rem*, notice is served upon the thing itself."

In *Hollingsworth* v. *Barbour*, 4 Pet. 475, the same court adopt the language used by the circuit court below, and say: "It is an acknowledged general principle that judgments and decrees are binding only upon parties and privies. The reason of the rule is founded on the immutable principle of natural justice that no man's right should be prejudiced by the judgment or decree of a court without an opportunity of defending the right. This opportunity is afforded, or supposed to be afforded, by a citation or notice to appear, actually served; or, constructively, by pursuing such means as the law may, in special cases, regard as equivalent to personal service. The course

of proceedings in admiralty causes, and some other cases where the proceeding is strictly *in rem*, may be supposed to be exceptions to the rule. They are not properly exceptions. The law regards the seizure of the thing as constructive notice to the whole world, and all persons concerned in interest are considered as affected by this constructive notice. But, if these cases do form an exception, the exception is confined to cases of the class already noticed, where the proceeding is strictly and properly *in rem*, and in which the thing condemned is first seized and taken into the custody of the court."

In *Walden's Lessees* v. *Craig's Heirs*, 14 Pet. 154, the same court says: "It is admitted that the service of process or notice is necessary to enable a court to exercise jurisdiction in a case, and if jurisdiction be taken where there has been no service of process or notice the proceeding is a nullity. It is not only voidable, but it is absolutely void." In *Shelton* v. *Tiffin*, 6 How. 186, the same court says: "Had the circuit court which rendered that judgment jurisdiction of the case? * * * No process was served upon L. P. Perry, nor does it appear that he had notice of the suit until long after the proceedings were had. But there was an appearance by counsel for the defendants, and defence was made to the action. This being done by a regularly practicing attorney it affords *prima facie* evidence, at least, of an appearance in the suit by both the defendants. Any individual may waive process and appear voluntarily."

The court then discusses the evidence tending to show that the attorney was not authorized by L. P. Perry to appear, and proceeds: "But the appearance by counsel, who had no authority to waive process or to defend the suit for L. P. Perry, may be explained. An appearance by counsel under such circumstances, to the prejudice of a party, subjects the counsel to damages, but this would not sufficiently protect the rights of the defendant. He is not bound by the proceedings, and there is no other principle which can afford him adequate protection. The judgment, therefore, against L. P. Perry must

be considered a nullity, and consequently did not authorize the seizure and sale of his property."

In *Boswell's Lessees* v. *Otis*, 9 How. 360, the same court say: "It may be difficult, in some cases, to draw the line of jurisdiction so as to determine whether the proceedings of a court are void or only erroneous; and in such cases every intendment should be favorable to a purchaser at a judicial sale. But the rights of all parties must be regarded. No principle is more vital to the administration of justice than that no man shall be condemned in his person or property without notice and an opportunity to make his defence."

In *Nations* v. *Johnson*, 24 How. 203, the same court say: "Notice to the defendant, actual or constructive, however, is essential to the jurisdiction of all courts, and it was held by this court in *Webster* v. *Reid*, 11 How. 460, that when a judgment is brought collaterally before the court as evidence it may be shown to be void on its face by want of notice to the person against whom it is entered."

So in *Bloom* v. *Burdick*, 1 Hill, 139, the supreme court of New York, by Mr. Justice Bronson, say: "The surrogate undoubtedly acquired jurisdiction of the subject-matter, on the presentation of the petition and account, but that was not enough. It was also necessary that he should acquire jurisdiction over the *persons* to be affected by the sale. It is a cardinal principle in the administration of justice that no man can be condemned or divested of his right until he has had the opportunity of being heard. He must, either by serving process, publishing notice, appointing a guardian, or in some other way be brought into court, and if judgment is rendered against him before that is done, the proceeding will be as utterly void as though the court had undertaken to act where the subject-matter was not within its cognizance. This is the rule in relation to all courts, with only this difference, that the jurisdiction of a superior court will be presumed until the contrary appears, whereas an inferior court, and those claiming under its authority, must show that it had jurisdiction."

In *Thompson* v. *Somlie*, 2 Pet. 169, the supreme court quotes and adopts the following language: "When a court

has jurisdiction it has a right to decide every question that occurs in the cause, and, whether its decisions be correct or not, its judgment, until reversed, is regarded as binding in every other court. But if it acts without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void, and form no bar to a recovery sought in opposition to them, even prior to a reversal." This last case is an authority for the position that as against persons who were parties to the cause or proceeding, and those in privity with them, the determination of every fact, including facts which the court must find in order to maintain its jurisdiction of the cause, is final and conclusive as against a party unless reversed, and cannot be disputed by such party in any collateral proceeding or suit. The plain ground of this doctrine is that even jurisdictional facts, so called, may be put in issue, and the court has authority and jurisdiction to try that issue, and what is or may be put in issue in a cause is, upon the strongest grounds of public policy, conclusively determined by judgment as between those who are parties to the cause, unless reversed by an appellate court. This doctrine, as applicable to what are called jurisdictional facts, is recognized by the courts of New York. *Dyckman* v. *Mayer*, 5 N. Y. 434. See, also, *In re Griffith*, 18 N. B. R. 510.

These authorities show very clearly what are the essentials of "due process of law," in reference to any judicial proceeding which, directly or indirectly, operates to deprive any person of his property or its beneficial use or enjoyment, or the recovery of its possession in the courts. What is absolutely indispensable is, unless he has consented to the act of deprivation, that he shall have notice of the proceeding, either actual, or, in proper cases, constructive, by publication or by seizure of the thing itself; and that he shall have an opportunity to be heard in defence of his right or title. If the proceeding is wanting in these essentials, then, by the principles of the common law, whatever force and effect the judgment may otherwise have, it cannot bind him; he is not, and cannot be treated as a party to the judgment without a violation of what is regarded as a fundamental rule of natural

justice.   This rule of the common law is obviously intimately connected with the constitutional prohibition upon the states and the general government, forbidding them to deprive any person of his property without "due process of law."

Those constitutional guaranties were devised and intended to perpetuate and guard against legislative and judicial infringement this principle of English and American liberty. Indeed, some eminent authorities have gone so far as to say that, independently of the constitutional restrictions on the powers of government embraced in the prohibitions against the violation of the obligation of contracts, and the taking of private property from one person and giving it to another without due process of law, the legislative power in these states does not extend so far on the ground that such encroachments on private rights are not a proper subject of governmental action.   By *Story,* J., *Williamson* v. *Leland,* 2 Peters, 657; by *Bronson,* J., *Taylor* v. *Porter,* 4 Hill, 144.

Tested by these authorities, the proceedings by which, if they are valid, the plaintiff has been deprived of his property cannot be considered due process of law.   Without any process whatever, so far as he is concerned, and without notice to him, actual or constructive; without his having any opportunity to be heard in defence of his title, and by force of a decree or decision of a court thus made which is declared by statute to be conclusive of the fact found that he is dead, the title to this property, which belongs to him, is transferred to another.   The fact that other persons, his next of kin, had notice, is immaterial.   Their interest in the matter is adverse to him, and if the proceedings were by "due process of law" as to them, that cannot make them so as to him.

In fact, the whole proceeding is based on the idea that there was no longer any such person as this plaintiff, and consequently the statutes made no provision whatever for notice to or process to be served on him.   He was not in any sense a party to the proceeding, and, according to the principles of common law, the decision was not binding upon him.   As repeatedly held by the supreme court the decision by the surrogate, as against him, that he is dead, cannot be regarded

as a valid judgment against him. It is void for want of the essential and vital ingredients of a judgment.

The proceeding was not a proceeding *in rem*, so that the seizure of the property itself by the officer of the court could be considered as constructive notice. There was no seizure anterior to the decree or judgment declared to be binding on him. In all proceedings *in rem* the seizure precedes and supports the decree. Here the decree is relied on as justifying a possession subsequently taken. Nor was his property taken under the taxing power of the state, where the "due process of law" may be, in the first instance, at least, an executive proceess, and not a proceeding by judicial forms. *Murray's Lessees* v. *Hoboken L. & I. Co. ut supra; Davidson* v. *New Orleans*, 96 U. S. 162.

It is, however, insisted that the proceedings are by "due process of law," because, by going out of the state and remaining away for so long a time, the plaintiff subjected his property to the operation of the laws of the state. It is also claimed that a presumption of death arose from his absence for more than seven years. In the case of *Roderigas* v. *East River Savings Institution*, 63 N. Y. 473, Judge Miller gives as a reason why the statute making the finding of the surrogate conclusive on the supposed decedent, in favor of innocent persons dealing with the administrator, is not to be regarded as taking his property without due process of law, that it is competent for the legislature "to provide safeguards for the protection of innocent persons who act under the decree of a competent court, and thus remedy the evils which would result from a want of such power." He says: "At most such laws are but regulations in regard to a subject of general interest to the community, and are essential to the welfare of society, the promotion of justice, and the proper administration of estates. In the case at bar it was no fault of the defendants that they paid the demand to an administrator duly qualified, and the blame, if any, rests with the party who, by a long absence, placed himself in a position where he was supposed to be dead."

This justification of the statute is an attempt to bring this

legislation within the limits of that large class of state legislation generally known as the police power of the states, which has been said to comprehend, in its widest sense, "the whole system of internal regulation by which the state seeks not only to preserve the public order and to prevent offences against her authority, but also to establish, for the intercourse of one citizen with another, those rules of justice, morality and good conduct which are calculated to prevent a conflict of interests, and to insure to every one the uninterrupted enjoyment of his own, as far as is reasonably consistent with a like enjoyment of equal rights by others. It extends, says another eminent judge, to the protection of the lives, limbs, health, comfort and quiet of all persons, and of all property within the state, as exemplified in the maxim, *sic utere tuo ut alienum non lædas. Thorp* v. *Railroad,* 27 Vt. 147." By *Clifford, J., dissenting, Tennessee* v. *Davis,* S. C. U. S., October term, 1880. Judge Miller also says, (63 N. Y. 474:) "While a person is thus absent creditors may attach his property, the state may dispose of his real estate by a sale for taxes, and the local authorities of a municipality by an assessment sale."

No question can be made of the power and right of the state to provide by law for the application of the property of absent persons to the payment of their just debts. This is one of those cases in which the courts have recognized the giving of notice by publication according to law after an attachment as constructive notice, and such an attachment and publication would unquestionably be due process of law. So the right to levy on property for taxes is recognized as "due process of law," where, by long usage, and the necessity of the case, judicial "process" is not required. But it may well be doubted whether any state ever provided for applying the property of an absent defendant to the payment of the owner's debts without an attachment, which is a seizure of the thing itself, or without publication, which is the best form of notice the circumstances admit of. Certainly the state of New York never passed such a law. On the contrary, the rights of absent defendants to "due process of law" are in these respects carefully guarded. The refer-

ence, therefore, to the power to subject the property of absent persons to attachment for their debts does not tend to show that the process in this case was "due process of law," but rather the contrary; all the ordinary incidents of such process which alone make it "due process" are wanting. Nor is the object and design of the laws in question to apply the property to the payment of debts. Though that is incidentally provided for, their chief object, as well as their chief effect, is to distribute it among the supposed next of kin, who have in fact no right to it.

There can be no question, also, that it is within the power, and is the duty, of the state to provide all proper safeguards for the protection of innocent persons who have been led into mistake, to their injury, by the action of the surrogate, or otherwise; but, as it seems to me, this laudable and proper legislation must stop where it will operate to deprive another innocent person of his property for their benefit. There are some misfortunes that even the most innocent cannot be protected against by the power of the state. Such is the case of persons who are innocently misled into the belief that void judgments are valid, as in the case of a suit carried on against a person supposed to be alive, but in reality dead. *Loring* v. *Folger*, 7 Gray, 505; *Jochimsen* v. *Savings Bank*, 3 Allen, 87.

In fact, this argument for the protection of the innocent sufferer against the consequences of the acts of another, by whom he has been misled into the misfortune of parting with his money, seems to be a misapplication of the doctrine of estoppel *in pais*. If the plaintiff has, by his conduct or declarations, induced the defendant to pay this money to the person holding the letters, then he will be estopped to deny the authority of that person to receive it; but every case of estoppel *in pais* must rest on its own peculiar circumstances. The defendant has not pleaded an estoppel *in pais*, but an estoppel by record—a judgment alleged to be binding on the plaintiff. Nor has any court directly or plainly put the exemption of the defendant from liability, in a case like this, on any other ground than such an estoppel by record. Nor does it seem to me that a person remaining out of the state for however long

a time, and failing to make known to persons within the state the fact of his continued existence, imports such a representation that he is dead that another person learning of these facts, or being able by inquiry to learn them, and also to ascertain that they are the sole foundation for the issu of the letters of administration, can be said to be deceived as to any matter of fact.

The facts, indeed, are not inconsistent with continued life. The second case of *Roderigas* shows clearly that a person dealing with an administrator is held not only to knowledge of what evidence the surrogate acted on, which can be ascertained by inspection of the record, but also to inquiry as to whether he acted judicially or not—a fact which may be contrary to what appears on the face of the record. Applying this rule ; and all persons dealing with a person holding letters in a case like this must be held to know that the proof of death rests wholly on evidence not inconsistent with the fact of life, and, that, therefore, if the person is alive the judgment of the surrogate that he is dead cannot be conclusive against him; there is, as it seems to me, no element of an estoppel *in pais*, because there is no deception or false representation of any fact. The party deals with the matter knowing that the supposed decedent may be alive. He knows, therefore, it would seem, that he takes or deals with his property subject to that risk. But, however this may be, there is another ground on which the doctrine of equitable estoppel clearly cannot avail to sustain this proceeding.

It is the established rule of law that no person can avail himself of the declarations or conduct of another person as an equitable estoppel or estoppel *in pais*, unless those declarations or that conduct was in fact known to him at the time he parted with value or otherwise altered his position in reliance thereon, for the very obvious reason that the ground and the only ground of the estoppel is that the party was influenced by the declaration or conduct to part with value or otherwise change his course of action. And nothing can be clearer than that declarations or conduct of one person, in order to influence the action of another, must be known to

him. *People* v. *Bank of North America*, 75 N. Y. 561. Now,
the rule declared by the statute in question is that the inno-
cent third person who pays out his money in reliance upon
letters issued by the surrogate, regular in form, provided the
surrogate determined judicially the fact of death, can, in all
cases, claim the benefit of an estoppel by such a record against
the supposed decedent. And the law, in its application, is
not limited to cases in which the decision of the surrogate is
founded on evidence as to the conduct or the voluntary acts
of the supposed decedent, as for instance, his leaving the state
and remaining away without communication for such length
of time as has been held to raise a presumption of death for
certain purposes.

The statute applies to all cases whatsoever in which, upon
any competent proof, the surrogate determines that the man
is dead; as, for instance, where the evidence is that he
shipped on board a certain vessel which was lost at sea, or
that he was killed in a railroad disaster, or shot in the
streets shortly before the petition for letters was filed. It is
obvious that there are very many states of proof, wholly with-
out regard to any voluntary action of the supposed decedent,
which may have resulted in the decision of the surrogate.
All that a person relying on the letters, therefore, can be
held to know, or be informed of by the same being communi-
cated to him, is that, upon some competent evidence, the
surrogate has found the fact of death. This clearly is not,
in itself, any knowledge of any conduct on the part of the
supposed decedent.

There is not, therefore, the essential element of an equita-
ble estoppel, that the party relied on the conduct of the
party—that is, upon his voluntary and unexplained absence—
for that is not implied in the surrogate's finding, even if such
absence would, in any case, work an estoppel. If this stat-
ute were limited to the single case of a person who had left
the state and not been heard from for a certain length of
time, then there would be some force in the argument that a
person relying on the letters was influenced by his knowl-
edge of the fact, because in that case the letters could not

properly issue, except on proof of that fact to the satisfaction of the surrogate.    There is, therefore, no ground for holding that the rule of the statute can be defended on the principles of estoppel *in pais.*

As to this particular case there is no evidence that the defendant knew or relied on anything but the New York letters. There is no evidence that the defendant knew or inquired upon what evidence Lavin was found by the surrogate to be dead.    And if they had seen the proofs exhibited to the surrogate they would not have given any information as to any voluntary act or conduct of the plaintiff, except that he was absent from Rhode Island without proof of his being alive. Therefore the defendant cannot be held to have been influenced by the plaintiff's alleged conduct in absenting himself from the state for so long a time without communication. Any further discussion of the doctrine of equitable estoppel, as applied to the case, is unnecessary.

The position taken that all persons hold their property subject to existing laws must be conceded, with some very important limitations.    Unquestionably all persons within the jurisdiction of the state hold their property subject to restriction as to its use by the exercise, on the part of the state, of the police power already referred to, and, in this sense, subject to the laws of the state, whether enacted before or after the title was acquired.    But the laws must be valid and constitutional laws.    The state cannot take away from property the essential character of property.    It cannot, under cover of the exercise of the police power, make property already acquired, or thereafter to be acquired, subject to be taken away from its owner without due process of law. It could not pass a general law providing as to all after-acquired property that it should be held on the tenure or condition that, in certain prescribed cases, it should be taken from the owner and given to another without any form of judicial proceeding, without notice or an opportunity to be heard.

A construction which would allow this would, in effect, allow

a state, by law, to abrogate within its limits the institution of property altogether. And, although it is true that that which a man has not cannot be taken from him, yet the necessary implication of the amendment is that *property*, as generally understood, with all its necessary incidents, shall forever be preserved within the limits of the Union. Nor can it be claimed that this particular statute can be sustained as not depriving persons of their property without "due process of law," on the ground that it is a well recognized and defined case, in which, from necessity and by long usage, anterior to the establishment of the constitution, process other than judicial, and wanting in the essential parts of *actor, reus, judex,* regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceeding has become "due process of law," as was held in respect to the executive warrant against a tax collector; for, on the contrary, this statute, as construed by the court of appeals, is conceded to be a novelty in legislation.

This mode of depriving a living person of his estate, by holding him concluded by a surrogate's decision that he is dead, has no support elsewhere in the authority of the English or American courts, so far as is shown. It has been by courts of the highest authority declared or treated as a legal impossibility. *Jochimsen* v. *Suffolk Savings Bank,* 3 Allen, 87; *Allen* v. *Dundas,* 3 T. R. 125; *Griffith* v. *Frazier,* 8 Cranch, 9; *Melia* v. *Simmons,* 45 Wis. 334; *Morgan* v. *Dodge,* 44 N. H. 259; *Duncan* v. *Stewart,* 25 Ala. 408; *McPherson* v. *Cauliff,* 11 S. & R. 422; *Bolton* v. *Jacks,* 6 Robt. 190. See, also, 15 Am. L. Reg. 212.

Every restriction on the power of the states contained in the national constitution may be expected, in some instances, to involve some hardship; and in this case it may be that the protection in this way of an innocent person who had, under a mistake as to the fact, lost his money by paying it to a person having no authority to receive it, might, in a certain sense, be considered humane, and if it were lawful, and infringed no one's rights, proper and commendable. But these restrictions upon legislation and judicial power are imposed

because, whatever hardship may attend their application in particular instances, the principle of personal liberty embodied in them—the preservation of private rights against infringement, except with the consent of the owner, or "by due process of law"—is of paramount importance and vital to the welfare of the community. The present case seems to me to be fairly within the letter of the spirit of the constitutional guaranty.

For these reasons it must be held that the proceeding taken under the laws of New York, which are set up as justifying the defendant's refusal to pay to the plaintiff the amount of his deposits, is void as to him, because it would deprive him of his property without "due process of law."

It is also claimed that, if the New York letters are void, the payment to the administrator may be justified under the Rhode Island letters, on the principle that though a foreign administrator cannot sue here without obtaining ancillary letters, yet a payment to him is a good payment and discharges the debt. *Parsons* v. *Lyman*, 20 N. Y. 103.

But it is clear that the Rhode Island letters have no greater validity than the New York letters. The Rhode Island statute undertakes to do directly what the New York statute aims to accomplish by the more indirect method of declaring a judicial decision conclusive against a person not a party to it. In Rhode Island the court does not go through the form of deciding that the person is dead, but, conceding that he is only absent, distributes his estate "as if he were dead," without any notice or process upon him whatever.

I do not see how any respectable argument can be made that this is not depriving him of his property without due process of law, or how it can be necessary or reasonably proper for the proper government of the persons and the property within the jurisdiction of the state. That the state may make a law for taking care of abandoned estates, with proper provisions for notice to the absent or unknown owners, will not be denied, but this is not such a law. Moreover, this property was not in Rhode Island, nor subject to its jurisdiction. It was in this state. The fact that the pass-book hap-

pened to be there is immaterial. It was mere evidence of the indebtedness, and not a negotiable security for it. For these reasons the Rhode Island letters cannot avail the defendant.

I think it may be doubted whether the Rhode Island letters were such letters as are contemplated by the statutes of New York as original letters of administration, which authorize the issue of ancillary letters here at all, because they do not purport to be letters of administration on the goods and estate of a *deceased person.* But, as this point has not been argued by counsel, I have preferred not to put the decision of the case on this ground, and its further consideration is unnecessary.

Judgment for the plaintiff for $880.26, with interest from March 1, 1879, with costs.